IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| CLEARONE COMMUNICATIONS, INC., <br><br> Plaintiff, <br><br><br> vs. <br><br><br> ANDREW CHIANG; JUN YANG; LONNY BOWERS; WIDEBAND SOLUTIONS, INC.; VERSATILE DSP, INC.; and BIAMP SYSTEMS CORPORATION, <br><br> Defendant. | ORDER <br><br> GRANTING <br><br> PERMANENT INJUNCTION <br><br><br> Case No. 2:07-CV-37-TC |

In this trade secret misappropriation case, Plaintiff ClearOne Communications, Inc.

("ClearOne") obtained a favorable jury verdict against the Defendants.  ClearOne now seeks,

among other remedies,[1] a permanent injunction.  (See Pl.'s Mot. for Permanent Inj., Exemplary

Damages, and Entry of Final Judgment.)  Having reviewed the trial transcript, the jury's special

verdict, the parties' pleadings, exhibits submitted in support, and relevant case law, the court

holds that a permanent injunction against all of the WideBand Defendants[2] and Defendant Biamp

Systems Corporation is appropriate.  The court now enters its Findings of Fact and Conclusions

of Law below, explaining issuance of the Permanent Injunction, which is filed independently of

---

[1]The other remedies will be addressed in a separate order that will be filed in the near future.

[2]Collectively, the "WideBand Defendants" are Andrew Chiang, Jun Yang, WideBand Solutions, Inc. ("WideBand"), Lonny Bowers, and Versatile DSP, Inc.  (Jun Yang owns Versatile.)

this Order.

## FINDINGS OF FACT

The court finds that the following facts have been proven by a preponderance of the evidence.

ClearOne develops and sells products in the teleconferencing industry.  Defendants are competitors of ClearOne.

The trade secret at issue is called the Honeybee Code, which was designed to enhance sound quality in audio conferencing equipment.  It contains audio digital signal processing (DSP) algorithms and computer code.  To provide some understanding of these basic aspects of the trade secret, the following briefly describes some of the most basic technology in computer programming.

**Technical Background**

An algorithm—which often serves as the basis for computer programming—is a series of commands designed to accomplish a specific task.[3]  (Oct. 20, 2008 Trial Tr. [hereinafter Oct. 20 Tr.] at 136-37 (witness Tracy Bathurst, ClearOne's Chief Technical Officer).)  Because an algorithm dictates a specific order of inquiries, different algorithms could achieve the same result even if the inquiries are in a different order.  There are many choices, even in the most simple of algorithms, and there are no set rules for making those choices; different developers, even from the same company, would not come up with the same algorithm to solve the same problem.  (Id.

---

[3]The steps necessary to resolve a non-functioning lamp problem present an example of a very simple algorithm.  Step one: determine if the lamp is plugged in.  If yes, step two: replace the bulb.  If still not functioning, step three: purchase a new lamp.  (Oct. 20 Tr. at 136; Trial Ex. 505 (demonstrative).)

at 139-40; Oct. 20 Tr. at 95-96 (witness Tracy Bathurst); Oct. 22, 2008 Trial Tr. [hereinafter Oct. 22 Tr.] at 94, 128 (expert witness Thomas Makovicka).)

An algorithm's architecture refers to its overall organization.  Comprising the architecture is a series of functional blocks, each of which makes an independent inquiry and represents an individual step of the algorithm.  Naturally, the addition of functional blocks will result in a more complex algorithm.  And each block may have design parameters, which add additional detail to the output of the functional block.

An algorithm may be depicted in different ways, including in a block or flowchart form, a text or instruction-like form (whether in, e.g., English, Spanish, French, or German), source (or assembly) code (e.g., the programming language called C code),[4] or object (machine) code.  (Oct. 20 Tr. at 142-48, 150; see also Trial Ex. 506 (demonstrative chart depicting different representations of the same algorithm).)

When designing software, a programmer will usually start with a schematic diagram—a flowchart—of the algorithm.  (Oct. 20 Tr. at 137.)  At this stage, the programmer will develop the architecture, and specify the functional blocks and design parameters.  Once the flowchart is complete, the algorithm is generally converted into source code, which programmers are able to read and understand. (E.g., id. at 144-45, 237.)  Often the source code is then converted into object code or machine code, which the computer can read and understand.  (Id. at 145-46; Oct. 22 Tr. at 165-66.)  Software known as a "compiler" is frequently used to convert the source code

---

[4]C code is a higher-level computer programming language that is more human and portable (i.e., independent of the computer chip it will be placed on).  (E.g., Oct. 20 Tr. at 144-45, 237.)

into object code.  In this conversion, the compiler will remove the parts of the source code which

the programmers could understand, leaving only code which is extremely difficult for a human to

decipher.  (Oct. 20 Tr. at 146-50; Oct. 21, 2008 Trial Tr. [hereinafter Oct. 21 Tr.] at 245 (witness

Tracy Bathurst); Oct. 22 Tr. at 165-67.)

Specific to this case, programmers have developed audio digital signal processing

("DSP") algorithms to enhance sound quality in audio conferencing.  (Oct. 20 Tr. at 111-12; see

also Trial Ex. 571.)  Examples of audio DSP algorithms are acoustic echo cancellation ("AEC")

and noise filtration.  Here, the Honeybee Code algorithms (a central part of the trade secret at

issue) are the same algorithms whether they are written in C code or assembly code.  (Oct. 21 Tr.

at 106.)  ClearOne and its predecessors used the Honeybee Code in their DSP products, such as

the ClearOne speaker phone. (E.g., Oct. 20 Tr. at 28, 30, 155, 160.)

## The Parties' Background and Business Dealings

On July 5, 2000, Gentner Communications Corporation ("Gentner") entered into an Asset

Purchase Agreement ("APA") to purchase assets from ClearOne, Inc. ("Old ClearOne"), a

company which developed and manufactured audio technology.  (July 5, 2000 Asset Purchase

Agreement, Trial Ex. 1.)  At that time, Defendant Andrew Chiang was the President of Old

ClearOne and signed the APA on behalf of the company.  (Id.)  Defendant Jun Yang was a

software and signal processing engineer with Old ClearOne.  (E.g., Oct. 24, 2008 Trial Tr.

[hereinafter Oct. 24 Tr.] at 141-42, 204, 227-28.)

Before July 2000 (when the APA was executed), Old ClearOne had developed certain

audio digital signal processing ("DSP") technology, computer code, computer architecture, and

digital audio processing algorithms for purposes of improving and maximizing performance and

clarity of audio conferencing, referred to in this litigation, collectively, as the "Honeybee Code."

(See generally Oct. 20 Tr. (T. Bathurst testimony); Oct. 21 Tr. (T. Bathurst testimony).)  The

Honeybee Code was an asset included in the APA.[5]

On the day the APA was executed, Dr. Yang accepted employment with Gentner and

signed a Confidentiality, Non-Competition, and Invention Assignment Agreement ("NDA").  As

part of the NDA, Dr. Yang agreed that:

> At all times, both while I am employed with the Company and after the
> termination of my employment with the Company, I will keep in strict confidence
> all Confidential Information and I will not use or disclose any Confidential
> Information or anything relating to it in whole or part, nor permit others to use or
> disclose it in any way, without prior or written consent of the Company, except as
> may be necessary in the ordinary course of performing my duties as an employee
> of the Company.

(Yang Confidentiality, Non-Competition, and Invention Assignment Agreement, July 5, 2000,

¶ 1.3 (hereinafter "Yang NDA") (Trial Ex. 2.).)

The Yang NDA expressly provided that "Confidential Information for this purpose

includes but is not limited to trade secrets, processes, formulas, computer programs, data

know-how, inventions, improvements, techniques, marketing plans, product plans, strategies,

forecasts, and customer lists, whether belonging to the Company or to any of its customers or

suppliers."  (Id. ¶ 1.1.)  And Dr. Yang agreed that "I understand that my employment with the

Company creates a relationship of trust and confidence between me and the Company with

respect to the Confidential Information that I may learn or develop during the period of my

---

[5]The APA transferred to Gentner "Intellectual Property, . . . goodwill associated
therewith," and defined Intellectual Property as "all inventions . . . all trade secrets and
confidential business information . . . all computer software . . . all other proprietary rights . . . ."
(APA ¶ 1, Trial Ex. 1.)

employment with the Company." (Id.)  Dr. Yang also agreed that any inventions related to Old

ClearOne's business "shall be the sole and exclusive property of the Company."  (Id. ¶ 3.2.)

Finally, under the terms of the NDA, Dr. Yang declared that he understood that any breach of

this agreement could cause irreparable harm to Old ClearOne, entitling the company to injunctive

relief.  (Id. ¶ 5.2.)

     In April of 2001, Dr. Yang resigned from Gentner. (Oct. 27, 2008 Trial Tr. [hereinafter

Oct. 27 Tr.] at 48.)

     On January 1, 2002, Gentner changed its name to ClearOne Communications, Inc.

("ClearOne").  (Id. at 74.)

     Later, ClearOne learned that Defendant Biamp Systems Corporation ("Biamp") (a

competitor of ClearOne)[6] agreed to license acoustic echo cancellation (AEC) technology from a

company founded by Gentner's and Old ClearOne's former employees Andrew Chiang and Jun

Yang, called WideBand Solutions, Inc. ("WideBand").  (Id. at 79.)  The technology Biamp

licensed from WideBand is called the "Biamp Code," which was eventually placed in a Biamp

product called the AEC2W Card.  (Id. at 267.)  Biamp obtained the object code from WideBand,

but Biamp never possessed or had access to the WideBand or Honeybee source code.  (Nov. 3,

2008 Trial Tr. at 121.)  By the end of 2006, Biamp had stopped marketing and had discontinued

the sale of its AEC2W products, which contained the Biamp Code.  (Oct. 27 Tr. at 204, 243;

Decl. of Jerry Payette, Biamp's VP of Finance, at ¶ 3 (attached as Ex. E to Biamp's Mem. Opp'n

to Pl.'s Mot. for Permanent Inj.).)

---

[6](Oct. 20 Tr. at 123.)

In January of 2007, ClearOne began this lawsuit against the WideBand Defendants and Biamp.

Around that time, WideBand had been in negotiations with Harman Music Group, Inc. to license its AEC technology to Harman.  By February of 2007, WideBand informed Harman of this suit, but the two entities continued their negotiations.  On July 26, 2007, WideBand and Harman consummated the licensing agreement, expressing that Harman "desires WideBand to develop AEC Technology specific to [Harman]'s intended application (the source code for which will be owned by WideBand and will constitute trade secret technology of WideBand), and to thereafter license to [Harman] the machine/object code for the same . . . ."  (License Agreement, ¶ 1.3, attached as Ex. 10 to Pl.'s Mem. Supp. Mot. for Prelim. Inj.)  But based on a motion from ClearOne, and after an evidentiary hearing, the court issued a preliminary injunction stopping the transfer of the licensed code ("the Harman Code") to Harman.  (See Oct. 30, 2007 Order & Mem. Decision (Dkt # 572).)  In the October 30, 2007 Preliminary Injunction Order, the court found a substantial likelihood that Dr. Yang derived the Harman Code from the Honeybee Code.  (Id. at 19.)

**Relevant Testimony and Evidence**

During trial, ClearOne's expert witness, Thomas Makovicka, testified that the following codes contained or were substantially derived from the Honeybee Code: WideBand's FC101 Code, WideBand's WC301 Code, WideBand's WC301A Code, the Biamp Code, WideBand's Simphonix Code, and the Harman Code.  (E.g., Oct. 21 Tr. at 273-74, 287, 293-95; Oct. 22 Tr. at 20-41, 53-71, 76-82, 87-89, 97-122, 127, 144-46, 159-64, 170-72, 177-80; Oct. 23, 2008 Trial Tr. [hereinafter Oct. 23 Tr.] at 167-78, 182, 190-91; Trial Exs. 141, 143-147, 162-163, 165, 188-

188A, 205.)

ClearOne also introduced evidence (obtained by a forensic computer imaging expert based on a court order) that its trade secret, including the Honeybee Source Code, was on Dr. Yang's, Mr. Chiang's, Mr. Bowers's, and the WideBand company computers, and that some such files had been in active use at some time since they were loaded onto the computers.  (See Oct. 23, 2008 testimony of R. Knudsen, with accompanying exhibits.)   The WideBand Defendants were not authorized to have any such files on their computers.  (Oct. 24 Tr. at 103-09, 122, 124, 133.)

**Instructions to the Jury**

After all the evidence was received and the parties gave their closing arguments, the court instructed the jury concerning the name and nature of the trade secret claimed by ClearOne at trial:

> ClearOne claims as trade secrets **the algorithms and the implementation of those algorithms that are reflected and embodied in the Honeybee Code.** ClearOne considers **source code and object code** to be part of the Honeybee Code.  ClearOne also claims that its **product development documentation** for the Honeybee Code is a trade secret.  For convenience, I will refer to all this information together as the "Honeybee Code" or "Honeybee Algorithms."  It is the Honeybee Code that ClearOne alleges was misappropriated by Mr. Bowers, Mr. Chiang, Versatile, Wideband, and Dr. Yang.
>
> ClearOne has made a separate claim for misappropriation of trade secret against Biamp.  Specifically, ClearOne alleges that the trade secret misappropriated by Biamp was one or more of the Honeybee Algorithms that ClearOne claims are contained in audio DSP [Digital Signal Processing] technology that Biamp licensed and obtained from Wideband.
>
> Because the Honeybee Code, including one or more of the Honeybee Algorithms, is the claimed trade secret at issue here, you should first decide whether the Honeybee Code is a trade secret. . . .

(Jury Instruction No. 18 (Dkt 1285) (emphasis added).)

**The Jury's Verdict**

**WideBand Defendants**

The jury found that each of the WideBand Defendants wilfully and maliciously misappropriated "a trade secret" from ClearOne.  (Special Verdict (Dkt # 1286).)  In addition, the jury found that Dr. Yang had violated his NDA and that both Dr. Yang and Mr. Chiang wilfully and maliciously violated fiduciary duties owed to ClearOne.  (Special Verdict (Dkt # 1286).) The jury further found that Mr. Chiang and Dr. Yang each owed ClearOne punitive damages for wilfully and maliciously breaching their fiduciary duties to ClearOne.  (Jury Instruction No. 37 (Dkt # 1285); Jury Instruction Re: Punitive Damages (Dkt # 1288); Special Verdict Re: Punitive Damages Against Andrew Chiang (Dkt # 1289); Special Verdict Re: Punitive Damages Against Jun Yang (Dkt # 1290).)

**Biamp Systems Corporation**

The jury found that Biamp wilfully and maliciously misappropriated "a trade secret" from ClearOne.

**The Misappropriated Trade Secret**

Given the evidence presented during trial, the instructions to the jury, and the jury's verdict, the court finds that the "Honeybee Code" (including its unique algorithms or sub-algorithms that are not in the public domain), whether in the form of source code, object code, or any other form (including product development documentation) is the "trade secret" that, as found by the jury, Defendants willfully and maliciously misappropriated from ClearOne.

The Honeybee Code: (a) derives independent economic value, actual or potential, from

9

not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and that is the subject of efforts that are reasonable under the circumstances to maintain its secrecy; and (b) is the combination of those characteristics and components of the Honeybee Code that are in the public domain, but which as a unified process, design and operation of which in unique combination is not generally known and differs significantly from other processes, designs or operations that are generally known.

The court further finds that the following products contain the Honeybee Code or code substantially derived from the Honeybee Code: (a) the AEC2W object code licensed to Biamp by WideBand (also known as the Biamp Code); (b) the computer code that WideBand licensed to non-party Harman Music Group, Inc. ("the Harman Code"); (c) WideBand's FC101 product; (d) WideBand's WC301 product; (e) WideBand's WC301A product; and (f) WideBand's Simphonix product.

**Post-Trial Proceedings**

After trial, the court issued an expanded preliminary injunction that barred the WideBand Defendants' use or disclosure not only of the Harman Code but other codes discussed during trial and post-trial proceedings.  (See Feb. 4, 2009 Order Expanding Preliminary Inj.)  In that order, the court cited to evidence that the WideBand Defendants were still marketing or selling products that contain the trade secret.  (Id. at 4.)

**CONCLUSIONS OF LAW**

The Utah Uniform Trade Secrets Act, Utah Code Ann. §§ 13-24-1 to 13-24-9 (2005) (UUTSA),  provides authority to the court to order injunctive relief when a trade secret has been

10

misappropriated.  Utah Code Ann. § 13-24-3(1).  Furthermore, "[i]n appropriate circumstances, affirmative acts to protect a trade secret may be compelled by court order." § 13-24-3(3).

Because the purpose of a permanent injunction is to prevent future violations, ClearOne must show "that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive."  United States v. W.T. Grant Co., 345 U.S. 629, 633 (1953), quoted in Roe v. Cheyenne Mountain Conference Resort, Inc., 124 F.3d 1221, 1230 (10th Cir. 1997) (court must consider "whether the facts indicate a danger of future violations"of law at issue).  A defendant's representation that the means for repeating the wrong no longer exists and the defendant's disclaimer of any intention to commit further violations "does not suffice to make a case moot although it is one of the factors to be considered in determining the appropriateness of granting an injunction against the now-discontinued acts." W.T. Grant Co., 345 U.S. at 633.  In fact, "the court's power to grant injunctive relief survives discontinuation of the illegal conduct."  Id.

To obtain the permanent injunction it seeks, ClearOne must show not only actual success on the merits, but also that (1) it will suffer irreparable harm unless the injunction is granted; (2) legal remedies will not adequately compensate for that harm; (3) the balance of hardships between ClearOne and the Defendants favors ClearOne; and (4) issuance of the injunction will not adversely affect the public interest.  eBay Inc. v. MercExchange, LLC, 547 U.S. 388, 391 (2006);  Prairie Band Potawatomi Nation v. Wagnon, 476 F.3d 818, 822 (10th Cir. 2007).

Here, ClearOne has satisfied its burden to prove the existence of a trade secret, as noted by the jury's verdict finding that all the Defendants wilfully and maliciously misappropriated "a trade secret" held by ClearOne.  (See Special Verdict (Dkt # 1286).)  Based on ClearOne's

success at trial, it now seeks a permanent injunction containing numerous prohibitions that go beyond the scope of the two preliminary injunctions issued by the court.  (See Oct. 30, 2007 Prelim. Inj. (Dkt # 572); Feb. 4, 2009 Order Expanding Prelim. Inj. (Dkt # 1428); Pl.'s Proposed Permanent Inj. Order, attached as Ex. A to Pl.'s Mem. Supp. Mot. Permanent Inj. (Dkt # 1302).) For the reasons set forth below, the court concludes that ClearOne is entitled to a permanent injunction, but not to the extent proposed by ClearOne.

**Actual Success on the Merits**

Given the jury's verdict and based on evidence presented during trial, ClearOne has succeeded on its claim that the Honeybee Code (as defined above) is a trade secret and was wilfully and maliciously misappropriated by the Defendants.  Furthermore, it has established that the following products and technology (hereinafter "Infringing Products") illegally utilize the Honeybee Code:  the AEC2W object code licensed to Biamp Systems Corporation;  the computer code licensed to Harman Music Group, Inc. that was the subject of the October 30, 2007 Preliminary Injunction Order; WideBand's FC101 product; WideBand's WC301 product; WideBand's WC301A product; and WideBand's Simphonix product.

Even though ClearOne obtained success on the merits of its trade secret misappropriation claim, it must also satisfy the remaining elements necessary to justify issuance of a permanent injunction.[7]  See Winter v. Natural Res. Def. Council, Inc., 129 S. Ct. 365, 381 (2008) ("An

---

[7]The WideBand Defendants contend that ClearOne waived any claim that the Honeybee Code qualifies as a trade secret because ClearOne publicly disclosed the trade secret during trial. The court rejects this argument for the reasons set forth in pages three through fifteen of ClearOne's Response to WideBand Defendants' Opposition to ClearOne's Motion for Permanent Inj., Exemplary Damages, and Entry of Final Judgment.

injunction is a matter of equitable discretion [and issuance of an injunction] does not follow as a matter of course.").

**Irreparable Harm and Necessity of Permanent Injunction**

Irreparable harm is determined "based on such factors as the difficulty in calculating damages, the <u>loss of a unique product</u>, and existence of intangible harms such as <u>loss of goodwill or competitive market position</u>." <u>Dominion Video Satellite, Inc. v. Echostar Satellite Corp.</u>, 356 F.3d 1256, 1264 (10th Cir. 2004) (emphasis added). ClearOne has established that its competitive market position and the secrecy of its unique trade secret are threatened without the injunction and that it will be irreparably harmed if the Defendants are not permanently enjoined. In particular, ClearOne has established that there is a "cognizable danger"[8] that future violations will occur and so a permanent injunction is necessary to protect the trade secret and related interests established at trial.

> **ClearOne has established that damage to its competitive market position and goodwill is likely to occur if use of the Honeybee Code is not enjoined.**

Mr. Tracy Bathurst, ClearOne's Chief Technical Officer, testified that ClearOne's technological advantage has been, and is, the key to its dominant position in the audio conferencing professional ("installed") market, which is a very technical market. (Oct. 20 Tr. at 119-20.) There are not many competitors in the installed market because the technology barrier to entry is high (e.g., acoustic echo cancellation and the associated digital signal processing are very difficult to develop). (<u>Id.</u> at 124; Oct. 27 Tr. at 133 (testimony of R. Lockhart, WideBand's

---

[8]<u>United States v. W.T. Grant Co.</u>, 345 U.S. 629, 633 (1953), <u>quoted in</u> <u>Roe v. Cheyenne Mountain Conference Resort, Inc.</u>, 124 F.3d 1221, 1230 (10th Cir. 1997) (court must consider "whether the facts indicate a danger of future violations" of law at issue).

expert witness).)  The fact that Dr. Yang used the Honeybee Code in violation of his NDA demonstrates that it is exceptionally difficult to create a functional code and algorithm—reflecting the immense value—as well as the immense harm presented by a competitor's possession of the technology.

Because of the value of the unique and functional Honeybee Code (including its AEC algorithm), any possession and use by a competitor (such as Biamp and WideBand) of that functional algorithm would irreparably harm ClearOne.[9]

**ClearOne has established a "cognizable danger" of future violations.**

The jury, after reviewing the evidence, found that the Defendants (competitors of ClearOne) willfully and maliciously misappropriated ClearOne's trade secret.  A trade secret must be kept confidential in order to be protected, and the jury found that ClearOne's competitors violated that confidentiality by knowingly taking that trade secret and using it to their own competitive advantage.

ClearOne has established a "cognizable danger" that the WideBand Defendants will commit future violations.  The record suggests that the Honeybee code may still be in the hands of the WideBand Defendants, who have been less than forthcoming with the court, and who (despite requests from the court and ClearOne) have not established that the products they sell today do not contain the Honeybee Code.  They have resisted further access to their computers by a third-party computer forensic expert to verify that the trade secret is no longer in their

---

[9]Although not dispositive, the express language from Dr. Yang's NDA recognizes "that my breach of this Agreement may cause the Company irreparable harm . . . ."  (Yang NDA, ¶ 5.2, Trial Ex. 2.)

possession.  Furthermore, Dr. Yang violated an express agreement (the NDA) that he would not use or disclose the Honeybee Code to or for anyone but ClearOne.  And the jury found that Dr. Yang and Mr. Chiang willfully and maliciously violated fiduciary duties owed to ClearOne. Such blatant disregard for clear duties, particularly those agreed to in writing, leaves little room for rational reliance on the goodwill and honor of those who misappropriated the trade secret to their commercial and financial advantage.

Relatedly, there is recent evidence that the WideBand Defendants were marketing one or more products after the jury issued its verdict, even though trial evidence showed that the products contained the trade secret.  Although the WideBand Defendants contend that such products do not contain the Honeybee Code, their representations are not sufficient to avoid an injunction.  See United States v. W. T. Grant Co., 345 U.S. 629, 633 (1953) (finding defendant's representation that it no longer had the infringing product and did not intend to use any infringing product was not necessarily sufficient to avoid injunctive relief).  They have not gone to any length to establish that the WideBand products evaluated by ClearOne's expert witness no longer contain the Honeybee Code or any code substantially derived from the Honeybee Code.  Without such an assurance, it is fair to conclude that the WideBand products found to be infringing during trial are still infringing.

Preventing use of the trade names associated with the infringing technology is a necessary consequence of the WideBand Defendants' misconduct.  By enjoining sales of specific WideBand Products containing and using the Honeybee Code, confusion is avoided.  Any market value WideBand may have acquired over the past few years through the use of its product names was obtained at the expense of ClearOne.  It is reasonable to require WideBand to start with a

15

clean slate, even if the WideBand Defendants contend that they sell products with the same names but the internal workings of the products do not contain the Honeybee Code.  As noted above, their unsupported representation is of no consequence.

As for Biamp, the possibility of future violations is less clear.  According to Biamp, it has destroyed all AEC2W hardware (which contained the AEC2W object code, or "Biamp Code") in its possession.  (Payette Decl. ¶ 4.)  Biamp contends that it has no intention to use or sell the AEC2W hardware or object code in the future, or to use or sell the object code licensed from WideBand in any other product.  (Id. ¶ 5.)  Further, according to Biamp's Vice President of Engineering, Biamp does not provide hardware replacement parts for the AEC2W, and Biamp has deleted the object code licensed from WideBand from all company computers.  (Decl. of Matt Czyzewski ¶ 3 (attached as Ex. F to Biamp's Mem. Opp'n to Pl.'s Mot. for Permanent Inj.).)  Although Biamp admits that the object code "may exist on archived backup media stored off-site," it still asserts that "Biamp has no intention of restoring files from archives short of a catastrophic system failure, and would not restore files containing the object code licensed from WideBand."  (Id. ¶ 4.)

Despite Biamp's representations, the court finds that the potential for harm to ClearOne absent a formal injunction against Biamp still exists.  The record shows that the Honeybee object code is potentially on Biamp's archived computer media.  And while the record does not show that Biamp knowingly would transfer the object code (assuming it exists in some form in Biamp's computer archives), a mistaken (but still unacceptable) transfer could occur.  For example, as institutional memory fades at Biamp and new Biamp employees replace those familiar with the suit, Biamp could, albeit unwittingly, transfer the object code to a third party

16

through, for instance, an asset sale.  Or if the archives are used to replace data lost through a computer system failure, an employee unaware of the suit could unknowingly place the object code back on Biamp's company computers.  Those possibilities weaken the well-meant assurances provided by Biamp's Vice President for Engineering and Vice President for Finance that the object code no longer exists on company computers and will not be placed on such computers.

For the foregoing reasons, the court concludes that ClearOne has satisfied this element of the permanent injunction analysis as to all Defendants.

**Legal Remedies Not Adequate**

In this case, legal remedies such as damages, are not adequate to protect ClearOne's trade secret and the competitive advantage ClearOne built over the years through development and purchase of the Honeybee Code.  Indeed, the UUTSA expressly recognizes that injunctive relief is a proper remedy when a trade secret has been misappropriated.  Given the nature of the misappropriation (willful and malicious), the court finds that a monetary remedy would not be sufficient to protect ClearOne's trade secret.

**Balance of Harms**

Under this element, ClearOne must show "that the injury to it if the injunction does not issue outweighs the injury to" the Defendants.  Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc., 805 F.2d 351, 356 (10th Cir. 1986). In view of the jury's verdict and the nature of the misappropriation (particularly by the WideBand Defendants), the balance of harms favors ClearOne.

The harm to ClearOne of denying the injunction is discussed above.  And any harm the

17

Defendants suffer from the injunction is the result of their own misconduct.  In other words, there can be no harm to the Defendants by enjoining them from engaging in illegal activities.  Consequently, the court finds that ClearOne has satisfied this element.

**Public Interest**

The public interest favors entry of the permanent injunction.  The integrity of the jury verdict and ClearOne's established trade secret must be protected.  Although the court recognizes the public has a strong interest in a competitive marketplace, the public has an even greater interest in honoring contractual obligations and in fostering honest competition.  See, e.g., SI Handling Sys., Inc. v. Heisley, 753 F.2d 1244, 1264 (3d Cir. 1985) (noting public policy in protecting "commercial morality" in trade secret case where misappropriation has been established);  Nat'l Bus. Servs., Inc. v. Wright, 2 F. Supp. 2d 701, 709 (E.D. Pa. 1998) (holding that public interest was "best served" by "[g]ranting a permanent injunction to [prevailing party in order to]  'discourage unfair competition, the misappropriation and wrongful use of confidential information and trade secrets and the disavowal of freely contracted obligations.'").

Moreover, the Utah Uniform Trade Secrets Act expressly allows entry of a permanent injunction, even in situations where misappropriation has not occurred but is threatened.  Utah Code Ann. § 13-24-3.  Here, after a substantial trial, the jury found that willful and malicious misappropriation actually occurred.  For the foregoing reasons, the court finds that the public interest is best served in this case by issuing a permanent injunction.

**Scope of Injunction**

"Equitable relief in the form of a permanent injunction is a proper remedy for the breach of a confidential relationship."  Zoecon Indus. v. American Stockman Tag Co., 713 F.2d 1174,

18

1180 (5th Cir. 1983) (granting permanent injunction against defendant found to have disclosed trade secrets).  See also, e.g., Pacific Aerospace & Electronics, Inc. v. Taylor, 295 F. Supp. 1205, 1220 (E.D. Wash. 2003) (granting employer permanent injunction after former employee misappropriated employer's trade secret).  Trade secret protection "extends not only to the misappropriated trade secret itself but also to materials 'substantially derived' from that trade secret."  General Elec. Co. v. Sung, 843 F. Supp. 776, 778 (D. Mass. 1994).

**WideBand Defendants**

ClearOne seeks an injunction that not only bars use and production of the Honeybee Code and products containing, or substantially derived from, the Honeybee Code, but also seeks to permanently enjoin Dr. Yang  from working in the fields of Acoustic Echo Cancellation (AEC), Noise Reduction ("NR") and Line Echo Cancellation ("LEC"), and to enjoin the WideBand Defendants from investing in or funding any start-up company working in the areas of AEC, NR, and LEC.  The court declines to grant all of the relief ClearOne seeks.

First, enjoining Dr. Yang from working in the industry would be anti-competitive.  Dr. Yang has a right to honestly earn a living.  Moreover, ClearOne's own expert witness testified that it is highly unlikely that the Honeybee Code could be reproduced without reference to the code itself because it was developed over a very long time by more than one engineer, and it contains very complex and detailed algorithms and source code that could not be recreated from memory.

Second, enjoining the WideBand Defendants from investing in or funding start-up companies in the AEC, NR, and LEC fields would also be anti-competitive.  And such a ban would not protect ClearOne's trade secret.

19

But the court does agree that the WideBand Defendants should be compelled to turn over every electronic and hard copy of any algorithm, source code, object code, documentation, or other materials containing or derived from the Honeybee Code. This should be accomplished through use of a third-party forensic computer expert and through a deposit of materials in escrow.

And the court also agrees in general with ClearOne's proposal to enjoin possession, use and disclosure of the Honeybee Code (or anything substantially derived from it) as well as anything found to contain the Honeybee Code.

The WideBand Defendants contend that ClearOne's proposed permanent injunction is impermissibly broad because it would "bar WideBand from selling products containing public domain attributes found in the HoneyBee Code. If successful, and because these attributes are so common, WideBand is threatened with the prospect of not being able to sell a single product." (WideBand Defs.' Mem. Opp'n Mot. Permanent Inj. at 58.) But the WideBand Defendants inaccurately characterize the Honeybee Code. Although the Honeybee Code contains some attributes found in the public domain, that is not the essence of the trade secret, as is made clear in the definition of the Honeybee Code in Jury Instruction No. 18.[10]

They also propose a different permanent injunction that contains exhibits showing tables

---

[10]To the extent the WideBand Defendants contend that the jury verdict finding misappropriation of "a trade secret" is so vague that it provides no reasonable basis from which to fashion a reasonable injunction, the court disagrees. See United States v. An Article of Drug, 661 F.2d 742, 746-47 (9th Cir. 1981) (rejecting argument that scope of injunction was too broad and that it was "impossible to tell from the general verdict which use or uses the jury found impermissible," explaining that "the evidence was also heard by the judge, and the judge, not the jury, determined the scope of the injunction based upon the judge's view of the facts established by the evidence.").

and diagrams setting forth aspects of the very trade secret the permanent injunction is meant to protect.  The WideBand Defendants' proposed injunction is too narrow and discloses highly confidential information concerning ClearOne's trade secret.  See, e.g., Melvin F. Jager, 1 Trade Secrets Law § 7:15 ("The injunction is not too broad if it does not spell out the trade secrets involved in the suit.  To do so would destroy the very existence of the secrets sought to be protected.").  Accordingly, the court declines to adopt the WideBand Defendants' proposed permanent injunction.

Moreover, the WideBand Defendants unconvincingly contend that they do not have sufficient notice of the scope and contents of the Honeybee Code so they run the risk of violating the permanent injunction proposed by ClearOne.  First, the jury found that they had the code in their possession and used it.  It is reasonable to expect that the WideBand Defendants will know to avoid the actions and the code that got them to court in the first place.  Second, their argument that Dr. Yang used his own skill and knowledge to develop WideBand products using algorithms in the public domain was clearly rejected by the jury.  Instead, the evidence suggests that, absent a reference to the misappropriated Honeybee Code documentation and source code, WideBand would not be able to recreate the infringing codes examined and described by Mr. Makovicka. Because the evidence shows that the enjoined WideBand products either used or were substantially derived from the Honeybee Code, those products are in essence a reasonable proxy for the trade secret, and specifically enjoining their use, sale, etc. provides sufficient notice to the Defendants about what actions are enjoined.  Furthermore, the WideBand Defendants have not provided any convincing evidence that the products no longer contain any aspect of the Honeybee Code.  "Uncertainties regarding the scope of injunctive relief are typically resolved

against the wrongdoer." A & H Sportswear Co., Inc. v. Victoria's Secret Stores, Inc., 967 F.

Supp. 1457, 1469-70 (E.D. Pa. 1997) (trademark case citing unfair competition case of

Champion Spark Plug Co. v. Sanders, 331 U.S. 125, 130 (1947)).

**Biamp**

ClearOne seeks an order that requires Biamp to search all of its computer records,

including archived media, to determine whether any copy of the Biamp Code still exists on the

computers or storage media and then to certify that Biamp has destroyed any vestige of the

Biamp code and is no longer in possession of anything that could potentially be linked to the

Honeybee Code.  But in view of the sworn representations of Biamp principals, as discussed

above, the court finds that such an order is not necessary.  A simple injunction on the use and

disclosure of the Biamp Code is sufficient.

## ORDER

For the reasons set forth above, the court orders as follows:

1.      Plaintiff ClearOne Communications, Inc.'s Motion for Permanent Injunction (Dkt

# 1302) is GRANTED IN PART AND DENIED IN PART.

2.      The court will enter the Permanent Injunction in a separate document.

3.      Each of the Defendants Lonny Bowers, Andrew Chiang, and Jun Yang is

HEREBY ORDERED to provide a copy of the Permanent Injunction to (a) any prospective or

new employer, (b) to any existing or potential licensee of any audio DSP product generated by

them, their company, or their employer, and (c) to any potential purchaser of WideBand or its

assets.

4.      Each of the WideBand Defendants is ORDERED to divest themselves of all

Protected Information, as defined in the court's March 9, 2007 Confidentiality Order, which was either produced by and/or originated from ClearOne or ClearOne's agents or representatives in this case, or which was copies and/or otherwise derived from Protected Information produced by and/or originating from ClearOne (or its agents or representatives) in this case, including without limitation any notes, summaries, e-mail, memoranda, exhibits, transcripts, and/or filings with the court (collectively, the "ClearOne Protected Information").

5.     To the extent the ClearOne Protected Information is in hard copy, it shall be collected and delivered to attorney Mark O. Morris at the Salt Lake City offices of Snell & Wilmer, where it will remain until (and if) it is requested by attorneys representing the WideBand Defendants on appeal, if such attorneys agree to abide by the Confidentiality Order entered in this case (Docket Entry No. 74).

6.     To the extent the ClearOne Protected Information is in electronic format, the procedure for its return shall be as set forth in the following paragraphs:

a.     ClearOne shall identify one or more certified computer forensic experts (the "Computer Forensic Expert") who have the skill and ability to clone and/or create mirror image reproductions of computer hard drives in a fashion similar to that previously conducted by WideBand Defendants through UHP Advisors, the computer forensic experts previously retained by the WideBand Defendants pursuant to Magistrate Judge Nuffer's order of July 6, 2007 (Docket Entry No. 282).

b.     As soon as possible thereafter, the Computer Forensic Expert shall participate in and supervise the following actions, and the WideBand Defendants shall

cooperate in all regards with the following:

i.       The Computer Forensic Expert shall create a log which identifies each and every one of WideBand Defendants' computers, including the make, model, size of the hard drive, location and (if possible) year of purchase.

ii.      The Computer Forensic Expert shall clone and/or create mirror image duplicates of all of WideBand Defendants' computers, including any all servers, laptops, hard drives, and personal computers, and including such computers that may be located at the personal residences of each of the WideBand Defendants.

iii.     The Computer Forensic Expert shall provide these clone and/or mirror image duplicates to the escrow agent selected by counsel for ClearOne and the WideBand Defendants' counsel Mark Morris.[11]

iv.      The Computer Forensic Expert shall supervise or participate in the gathering of all "ClearOne Protected Information" in electronic form in the possession and/or control of the WideBand Defendants.  Once identified and/or isolated, the Computer Forensic Expert shall supervise or participate in the permanent deletion of this information from WideBand Defendants' computers.

v.      The Computer Forensic Expert shall create a log, identifying the information permanently deleted, as described above, such as file name,

---

[11]Mr. Morris (and his firm) only represents the WideBand Defendants in the matter of ClearOne's motion for a permanent injunction, exemplary damages, and entry of final judgment.

file type, file size, location within the director structure on the hard drive, and the hard drive/computer on which it was located.  The Computer Forensic Expert shall provide these clone and/or mirror image duplicates to the escrow agent selected by counsel for ClearOne and the WideBand Defendants' counsel Mark Morris.

7.     As discussed at the close of the March 13, 2009 hearing on the motion for permanent injunction, the parties will place the materials (as described in paragraph 6 above and any other materials counsel for ClearOne and attorney Mark Morris agree to) in escrow according to the procedures agreed to by the parties during the hearing.

SO ORDERED this 8th day of April, 2009.

BY THE COURT:

TENA CAMPBELL
Chief Judge