IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| CLEARONE COMMUNICATIONS, INC., Plaintiff, vs. ANDREW CHIANG; JUN YANG; LONNY BOWERS; WIDEBAND SOLUTIONS, INC.; VERSATILE DSP, INC.; and BIAMP SYSTEMS CORPORATION, Defendants. | MEMORANDUM DECISION AND ORDER OF CONTEMPT Case No. 2:07-CV-37-TC |

In this trade secret misappropriation case, the court issued its First Order to Show Cause ("First OSC")[1] on January 26, 2009. In that order, the court required the individual WideBand Defendants[2] and Donald Bowers to show cause why they should not be held in contempt for violating the court's June 26, 2008 Order[3] enjoining encumbrance or transfer of disputed software codes.[4]

Based on a review of the pleadings and evidence, including evidence gathered during two

---

[1]Docket No. 1407.

[2]The individual WideBand Defendants are collectively Andrew Chiang, Jun Yang, and Lonny Bowers.

[3]Docket No. 908.

[4]Donald Bowers is not a defendant in this case, but he was subject to the court's June 26, 2008 Order, as will be described in more detail below.

evidentiary hearings,[5] and for the reasons set forth below, the court FINDS that DONALD

BOWERS IS IN CONTEMPT OF COURT for filing a UCC-1 Financing Statement in

Massachusetts on November 6, 2008, thereby encumbering WideBand Solutions' intellectual

property at issue in this trade secret litigation in violation of the court's June 26, 2008 Order.  He

is also IN CONTEMPT OF COURT for failing to appear at the February 10, 2009 contempt

hearing.

The court, however, finds that the record is insufficient to find any of the individual

WideBand Defendants guilty of contempt in connection with filing of the UCC-1 Financing

Statement or the April 2008 Security and Loan Agreements upon which the filing was based.

## FINDINGS OF FACT

### The June 26, 2008 Injunction Order

In June 2008, Donald Bowers and his company WideBand Solutions (a Georgia

corporation) ("WideBand Georgia") entered into an agreement with WideBand Solutions, Inc. (a

Massachusetts corporation) ("WideBand Massachusetts"), Lonny Bowers, Andrew Chiang, and

Jun Yang to transfer WideBand Massachusetts' assets to WideBand Georgia.[6]  (See Agreement

for Purchase & Sale of Business Including its Equipment, Software, & All Other Applicable

Intellectual Property, attached as Ex. A to Docket No. 897 [hereinafter the "WideBand Asset

Purchase Agreement"].)  At that time, Donald Bowers was loaning money to the WideBand

Defendants (including the corporate defendants WideBand Massachusetts and Versatile DSP,

---

[5]The hearings were held on February 10, 2009, and June 3, 2009.

[6]Apparently WideBand Georgia (of which Don Bowers is the major, if not sole, principal) was registered to do business in April 2008, presumably about the time the asset transfer was contemplated.  (See June 18, 2008 Hr'g Tr. (Docket No. 894) at 18.)

2

Inc.) to pay their legal fees.

ClearOne, upon receiving word of the already-completed transaction, filed a Motion for TRO & Preliminary Injunction Regarding Asset Disposition (Docket No. 890). This prompted a hearing on June 18, 2008 (which was ultimately followed by three more hearings). Mr. Randolph Frails appeared by phone as a legal representative for Donald Bowers at the hearing.

The court notes that, at that stage in the litigation, the court had already found, through a 2007 preliminary injunction hearing and order, that ClearOne had established a likelihood of success on the merits, including a preliminary finding that the source and object code held by the WideBand Defendants was indeed ClearOne's protected trade secret, the Honeybee Code. (See, e.g., June 20, 2008 Hr'g Tr. (Docket No. 925-2) at 3 ("[In 2007,] I found that ClearOne had demonstrated substantial likelihood that the Biamp code and algorithms were derived from the Honeybee. . . . And anyone even a little bit familiar with this litigation knows that my [2007 preliminary injunction] order went through and specifically traced the Biamp Code to the Honeybee Code. I mean there was no question."); June 18, 2008 Hr'g Tr. (Docket No. 894) at 9 (acknowledging findings and expressing concern that court's order may have been violated); Oct. 30, 2007 Prelim. Inj. (Docket No. 572) (barring transfer of any intellectual property or products containing the Honeybee Code).)

During the hearing, based on Mr. Frails' representation that the language of the WideBand Asset Purchase Agreement excluded sale of the code addressed by the court's 2007 injunction, the court denied ClearOne's June 18, 2008 TRO motion. But the court ordered the parties to disclose information confirming the nature of the transaction. (See June 18, 2008 Hr'g Tr. (Docket No. 894) at 22; June 18, 2008 Minute Entry (Docket No. 911).)

The next day, ClearOne (who by then had received a copy of the WideBand Asset Purchase Agreement) filed a renewed Motion for TRO and preliminary injunction because, contrary to Mr. Frails' representations,[7] the terms of the agreement did transfer intellectual property that the court preliminarily had found to be ClearOne's protected trade secret. (See Docket No. 897 ["TRO Motion"].) ClearOne's TRO Motion sought an order stopping the transaction reflected in the WideBand Asset Purchase Agreement, or to the greatest extent possible, stopping any further performance of that transaction by any of the WideBand Defendants.

That same day—June 19, 2008—ClearOne filed a separate lawsuit, in this court, against WideBand Georgia and Donald Bowers alleging fraudulent transfer. (See ClearOne Comm'ns, Inc. v. Wideband Solutions, Inc. (a Georgia corp.) & Donald Bowers, Case No. 2:08-CV-474-TS (D. Utah).)

The following day, on June 20, 2008, the court held a hearing on the renewed TRO Motion. During that hearing, the court discussed the 2007 preliminary injunction order:

---

[7]Mr. Frails' representations turned out to be inaccurate. But the court did not find, and is not finding now, that Mr. Frails committed perjury during the June 18, 2008 hearing. At a minimum, however, the individuals charged with the responsibility to adhere to the court's 2007 injunction (the WideBand Defendants, Mr. Donald Bowers, and Mr. Frails) failed in their responsibility to conduct due diligence and then draft and execute conforming documents. See June 20, 2008 Hr'g Tr. (Docket No. 925-2) at 3-4 ("I mean there was no question [about the contents of the court's 2007 preliminary injunction order.] And when I denied [ClearOne's TRO] motion earlier this week, it was based on the representation by counsel for the purchaser of WideBand Solutions that assets – that the code involved in this litigation was not transferred. But it was transferred [based on the language of the asset purchase agreement]. I'm feeling that there's been a little bit of hocus-pocus . . . ."); June 26, 2008 Hr'g Tr. (Docket No. 963) at 10 (in which Mr. Frails confirmed that Lonny Bowers was principal person from WideBand Massachusetts with whom Mr. Frails worked in connection with asset purchase transaction).

> The reason . . . my preliminary injunction only went to [the Harman Code] is because nothing was imminent on other fields. But I can tell you, had I known if there had been a sale in the wings of all [of WideBand's] code, like the Biamp Code, and they brought [sic] it, the order would have been broader. But what I'm saying is [my 2007 order] explains in connection with the complaint what code is at issue in this lawsuit. That is the code that has been transferred. That is the basis of this motion for a T.R.O.

(June 20, 2008 Hr'g Tr. (Docket No. 925-2) at 11.) During the hearing, Mr. Frails, again representing Donald Bowers and appearing by telephone, noted that he felt a hearing on ClearOne's motion for preliminary injunction would be appropriate and said, "even though we're [i.e., Donald Bowers and WideBand Georgia] not part of this litigation, we're quasi part of this litigation and, you know, we're inclined to do whatever the court tells us to do." (Id. at 14.) The court noted that it wished to issue an injunction that maintained the status quo. "I just don't want this sale to in any way put that code another step away from whatever is going to happen in this litigation." (Id. at 16.) The court expressly stated that it did not want WideBand Massachusetts "gutted." (Id. at 22.)

> Just don't do anything [including sale of the products that the court preliminarily found contained the ClearOne trade secret] – so that let's say worst case scenario for you I find that a majority or all of WideBand Massachusetts' codes were derived from the ClearOne algorithm. [Then] I say all of it goes back. . . . But if you've transferred that code on to somebody else, there are all sorts of problems.

(Id.) ClearOne then expressed its concern about "dissipation of [WideBand's] assets." (Id. at 24.) After hearing from Mr. Frails, the court stated:

> <u>I'm going to freeze things right now as – and if I have to do it only from the side of the WideBand Massachusetts side, but I don't want the sale going on getting more wound up until I can fully hear on whether what was sold could legitimately be sold.</u> That's the thing. I want to just stop everything in its tracks. I don't want money going back and forth, because if in fact ClearOne prevails and shows that these products are derived from code that belonged to it, then WideBand Georgia has got the money, but . . . the judgment would probably be against WideBand

Massachusetts. . . . So money needs to stop. <u>I don't want WideBand</u> <u>Massachusetts sending any money out. They might need to make ClearOne</u> <u>whole. They might not. I haven't had time and I won't for sometime to decide</u> <u>that. Things must stop. That's just what I'm saying. . . . [WideBand</u> <u>Massachusetts] can go on as it was just like before June 16th, whatever payments,</u> <u>whatever arrangements. I just don't want money going to WideBand Georgia that</u> <u>ultimately – that might be from the sale of products [containing the trade secret].</u>

(<u>Id.</u> at 26 (emphasis added).)  The court ordered counsel for the parties, as well as Mr. Frails, to work together to present the court with a proposed stipulated order.  (<u>Id.</u> at 34-35 ("And, Mr. Frails, you'll be involved too to some degree . . . .").  In the meantime, the court warned counsel: "Mr. Frails, Mr. Magleby, Ms. Porter, do not do anything, no hanky-panky with the code or the assets in the next few days, okay? . . . Because it would not be good."  (<u>Id.</u> at 35.)  The court set yet another hearing to continue addressing the issues and noted that "everything has now changed with this proposed sale" and with the filing of the fraudulent transfer action against Donald Bowers.  (<u>Id.</u> at 38.)

The court held a third hearing on June 26, 2008.  Mr. Frails appeared by telephone on behalf of Donald Bowers and WideBand Georgia.  By then, the WideBand Georgia fraudulent transfer case had been assigned to this court.  (<u>See</u> June 24, 2008 Docket Entry ("Notice of Case Reassignment") in WideBand Georgia Case (2:08-CV-474).)[8]  Counsel discussed their concerns about language in the proposed restraining order.  The court rejected the WideBand Massachusetts Defendants' argument for elimination of the language "any other persons who are in active concert or participation."  (June 26, 2008 Hr'g Tr. (Docket No. 963) at 11.)  The court then noted that such language would not be eliminated or limited by more specific listings.  "In

---

[8]The case has since been reassigned.

this case the problem is I don't think that I can limit it. I don't know who people acting in concert are, but I do know that it does appear there's something between the two Mr. Bowers, obviously, as seller and purchaser. I would think that Mr. Donny Bowers might be included." (Id. at 12.) The court decided to leave the language as written and noted that "if there's a request for contempt, I'll look at it carefully." (Id.) Although Mr. Frails did not have a copy of the final proposed TRO (although he had seen earlier versions of the proposed order), the court read a pertinent part of the order to Mr. Frails and stated that Mr. Frails would get a copy as soon as possible. (Id. at 17-19.)

The June 26, 2008 Order that is the subject of this contempt proceeding was the order the court approved from the bench during that hearing. (See June 26, 2008 Minute Entry (Docket No. 913).) Specifically, the court issued the injunction

> [f]or the reasons articulated by the court on June 18 and 20, 2008, and based upon the record in these proceedings, including the pleadings and papers on file with the court, the preliminary injunction hearing that was held in the Fall of 2007, the Memorandum Decision and Order (dkt. no. 572) that granted ClearOne's motion for a preliminary injunction [concerning transfer of code from WideBand Massachusetts to non-party Harman Music Group, Inc.], and the arguments and discussion with counsel . . . .

(Docket No. 908 at 1-2.)

The court held that the order "shall apply not only to the WideBand Defendants, but also each and every one of their agents, servants, officers, employees, entities, attorneys, and those acting under their direction or control and any other persons who are in active concert or participation with any of the WideBand Defendants." (Id. ¶ 2 (emphasis added).) The court also ordered the following:

The WideBand Defendants will take no further action in connection with any sale

7

or transfer of ownership of the following of the WideBand Defendants' assets to WideBand Georgia or any other person or entity: the FC101 code, the WC301 code, the WC301 code, the WC301A code, the Biamp code, the Harman code, and the SimphoniX code, whether consisting of source or object code, as well as the algorithms related thereto (collectively, the "Disputed Codes"). <u>This includes, without limitation, a prohibition upon the execution of any additional documents related to or necessary for the performance of the WideBand Sale Agreement to the extent it effects a sale or transfer of ownership of the Disputed Codes.</u> **This further includes, without limitation, any other action to convey, transfer, encumber or pledge ownership in any or all of the Disputed Codes in favor of WideBand Georgia**, including, without limitation, the performance of any licensing or **other agreements encumbering the Disputed Codes through or in conjunction with WideBand Georgia, even if such agreements were executed *prior to* the Court's issuance of a temporary restraining order on June 26, 2008.** In other words, WideBand Defendants will not allow or assist WideBand Georgia in any efforts to license or to transfer or, convey ownership or otherwise effect in any way any of the Disputed Codes.

(<u>Id.</u> ¶ 3 (emphases added).) The court further ordered that "[n]one of WideBand Defendants' profits from the Disputed Code[s] shall be transferred or conveyed to WideBand Georgia." (<u>Id.</u> ¶ 4.) The court stated that "[t]he spirit and intent of this order is to preserve status quo to the greatest extent possible, including to preserve documentary evidence relating to the transaction, and any ambiguity is to be construed consistent with such spirit and intent, and the Court's comments of June 18 and June 20, 2008." (<u>Id.</u> ¶ 6.)

Finally, the court directed the WideBand Defendants to make a full disclosure and production of all documents relating to the asset purchase agreement or "any related transaction not reflected in that agreement." (<u>Id.</u> ¶ 5.) This mandated disclosure covered what the WideBand Defendants now contend was a separate April 2008 Loan and Security Agreement, upon which the UCC filing was based. But, as noted below, nothing of any April 2008 agreement was disclosed until after the UCC filing had occurred and the court had initiated "show cause" proceedings.

8

The June 26, 2008 Order was entered with notice to all pertinent parties, including Donald Bowers, in an effort to preserve the status quo and prevent the sale or transfer of the intellectual property (and products alleged to contain the intellectual property) in dispute. (See, e.g., July 8, 2008 Return of Service (Docket No. 917) (proving June 30, 2008 personal service of D. Bowers at home); July 8, 2008 Return of Service (Docket No. 918) (proving July 1, 2008 personal service of WideBand Georgia care of R. Frails); Feb. 10, 2009 Hr'g Tr. at 9 (noting that D. Bowers was served with June 26, 2008 Order through his attorney, Randolph Frails).)

On July 10, 2008, after ClearOne filed yet another TRO motion, the court held a fourth hearing concerning the asset transfer (See ClearOne Mot. TRO & Prelim. Inj. Re: Asset Sale (Docket No. 914) (seeking broader injunction freezing disposition of all WideBand Massachusetts' assets, not just the disputed codes).) Mr. Frails again appeared by telephone on behalf of WideBand Georgia and Donald Bowers. (See July 10, 2008 Hr'g Tr. (Docket No. 966) at 2-3.) During the hearing, the court noted its inclination to grant the motion because "[i]t seems to me that through the papers ClearOne has shown that they will suffer irreparable harm if all the assets leave WideBand Massachusetts, go to WideBand Georgia, even perhaps becoming insolvent, and if there's a judgment, WideBand Massachusetts won't be able to respond. . . . [I]t looks like there are some real concerns about the transfer itself." (Id. at 3.)

When Mr. Frails was called upon to comment on the issue before the court, he stated:

> My client believed that he suffered harm as it related to your order dated I believe it was June 27th [sic], 2008. . . . [M]y client would like to have settled this matter by rescinding the sale. . . . In spite of [ClearOne's refusal to settle in that way], my client decided to rescind the sale anyhow. And so, therefore, the actual asset purchase has been rescinded because in essence my client felt that he was buying nothing.

(Id. at 3-4.)[9]  (Donald Bowers later confirmed Mr. Frails' representation by filing a copy of the

Agreement to Rescind.  (See Ex. B to Don Bowers' Answer (Docket Entry No. 12) in WideBand

Georgia Case, 2:08-CV-474 (D. Utah).))  Mr. Frails then represented that the TRO motion would

be moot "because we haven't transferred anything."  (July 10, 2008 Hr'g Tr. at 5.)  The court and

ClearOne's counsel agreed that the rescission mooted the basis for ClearOne's motion.  (See id.

at 4-5 (ClearOne's counsel said "we will rely on Mr. Frails' representations that nothing has

actually been transferred, the assets haven't been transferred obviously, the code hasn't been

transferred.").)  Accordingly, the court denied the motion as moot.  (See July 10, 2008 Order

(Docket Entry No. 11 in WideBand Georgia Case); July 10, 2008 Order (Docket Entry No. 922

in this case).)  Nothing was said of any April 2008 Loan and Security Agreements.

In October 2008, the court granted Don Bowers' motion to dismiss the WideBand

Georgia Case without prejudice on the basis that the claims, all of which concerned the rescinded

asset purchase agreement, were moot.  (See Oct. 20, 2008 Order (Docket Entry No. 23) in

WideBand Georgia Case;  Defs.' Mot. to Dismiss Without Prej. (Docket Entry No. 21 in

WideBand Georgia Case) at 2 (noting that ClearOne's claims in WideBand Georgia Case were

"based [entirely] on an asset purchase transaction that was rescinded").)

**The Jury Verdict**

On November 5, 2008, after a very contentious two-week trial, the jury in this case issued

a verdict in which it found willful and malicious misappropriation of ClearOne's Honeybee code

trade secret by the WideBand Defendants.  The verdict imposed millions of dollars in damages

---

[9]It is fair to infer from Mr. Frails' statement (that D. Bowers' believed he suffered harm
by the entry of the June 2008 Order) that Donald Bowers had notice of the order at this point.

on the WideBand Defendants, including WideBand Massachusetts and Lonny Bowers.  (See

Docket No. 1286.)

**Filing of the UCC-1 Financing Statement**

As was noted above, Donald Bowers had loaned money to the WideBand Defendants to

pay their legal fees in this suit.  On November 6, 2008, less than twenty-four hours after the jury

issued its verdict in this case, Donald Bowers filed, or caused to be filed, a UCC-1 Financing

Statement in the State of Massachusetts, listing WideBand Massachusetts as a debtor to Secured

Party Donald Bowers.  (See Ex. 4 of Feb. 10, 2009 Hr'g Binder; Feb. 10, 2009 Hr'g Tr. (Docket

Entry No. 1463) at 44-45, 84; June 3, 2009 Hr'g Tr. (Docket No. 1672) at 75-76; Ex. 12 of June

3, 2009 H'rg Binder (UCC Filing History for Secured Party Donald D. Bowers).)

The UCC-1 Financing Statement described the collateral as follows: "All the trade and

good-will of the Business, and the stock-in-trade, equipment, furniture and fixture, software,

computers, test equipment, all intellectual assets, intellectual property, patents, royalties, licenses

of the Business, inventory, accounts receivable, cash in banks."  (Ex. 4 of Feb. 10, 2009 Hr'g

Binder (emphasis added).)  The UCC filing was circumstantial evidence that an agreement

encumbering WideBand Massachusetts' intellectual property still existed or had been executed

since the court's June 26, 2008 Order, the July 7, 2008 Agreement To Rescind, and the court's

October 20, 2008 dismissal of the WideBand Georgia Case.

Donald Bowers had notice of the June 26, 2008 Order long before he filed the UCC-1

Financing Statement.

**The First Order To Show Cause and February 2009 Hearing**

The court, upon receiving Plaintiff ClearOne Communications, Inc.'s Motion for an

11

Order to Show Cause (see Docket No. 1394), issued the First OSC on January 26, 2009.[10]

Donald Bowers, among others, was served with the First OSC, which ordered him (and others) to appear before the court on February 10, 2009, to show cause why he should not be held in contempt. (See, e.g. Jan. 28, 2009 Proof of Non-Service (Docket Entry No. 1445) (server was told that Don Bowers no longer lived at 448 Bartram Trail Club Dr D, Evans, Georgia, 30809, and neither D. Bowers' wife nor Randolph Frails would tell server where D. Bowers lived); Jan. 29, 2009 Proof of Service (Docket No. 1446) (serving D. Bowers c/o Randolph Frails); Feb. 2, 2009 Proof of Service (Docket No. 1447) (serving D. Bowers c/o Randolph Frails); Feb. 2, 2009 Proof of Service (Docket Entry No. 1450) (process server affidavit stating that document was left at Bartram Trail Club Drive address c/o wife of D. Bowers); Feb. 10, 2009 Hr'g Tr. (Docket Entry No. 1463) at 58-59 (ClearOne attorney representing that server was lied to on Jan. 29, 2009, when he was told that D. Bowers had not lived at the Bartram Trail Club Drive address for over a year);[11] Ex. 22 in Feb. 10, 2009 Hr'g Binder).)

Before the hearing, in a written response to ClearOne's motion for an order to show cause, the WideBand Defendants disclaimed any knowledge of the UCC filing yet attempted to justify the UCC filing. They contended that the UCC filing was meant to secure Donald Bowers' interest in WideBand Massachusetts' assets based on an interest created by an April 2008 Loan Agreement and an April 2008 Security Agreement between Donald Bowers and WideBand

---

[10]See Docket No. 1407.

[11]Cf. July 8, 2008 Notice (Docket No. 917) at 4 (Proof of personal service of June 26, 2008 Order on D. Bowers at Bartram Trail Club Drive address, dated only six months before same server was told on January 28, 2009, that D. Bowers had not lived at that address for over a year).)

Massachusetts, in which Don Bowers had agreed to pay a certain amount of attorneys' fees incurred by the WideBand Defendants in this case. (See WideBand Defs.' Consol. Mem. Opp'n ClearOne's Mots. for OSC (Docket No. 1442) at ¶¶ 4-6, ¶ 12, & Ex. F.)

The WideBand Defendants appeared at the February 10, 2009 hearing, individually and through counsel. Donald Bowers, however, did not appear (nor did he contact the court) despite evidence (cited above) that he was properly served with the First OSC, had notice of the hearing date, and was ordered to appear in person.

During the hearing, the court received evidence that the WideBand Defendants did not disclose the April 2008 documents to ClearOne until a few days before the OSC hearing. Lonny Bowers testified that he relied on his father, Donald Bowers, and his father's attorney, Randolph Frails, to produce those documents to the WideBand Defendants' attorneys. Karra Porter, who was the attorney for the WideBand Defendants at the time the asset purchase agreement was executed, testified that she had never seen the April 2008 documents before and that in 2008 she had turned over every single discoverable document the court had ordered to be disclosed. (Feb. 10, 2009 Hr'g Tr. (Docket No. 1463) at 75-82.) The court noted, based on the record, that either the April 2008 documents were not produced, in violation of the court's June 26, 2008 order, or, arguably, were fraudulently created and submitted to the court to justify actions prompting the OSC. (See id. at 41, 44, 87-88.)

After listening to testimony during the February 10, 2009 hearing on the First OSC, and after considering the documentary evidence discussed and arguments made by counsel, the court determined that some transfer agreement existed and so the basis for dismissing the fraudulent transfer case against Donald Bowers and WideBand Georgia was no longer valid. Accordingly,

in a separate order, the court re-opened the WideBand Georgia Case. (See Feb. 24, 2009 Order
(Docket No. 24, <u>ClearOne Comm'ns, Inc. v. WideBand Solutions, Inc. (a Georgia corp.)</u>, Civil
Case No. 2:08-CV-474 (D. Utah)).) The court also determined that it must continue to address
the issues raised in the First OSC (i.e., violation of the June 2008 Order) and the February 10,
2009 hearing (i.e., possible violation of a discovery order and/or fraud on the court through
submission of forged documents) in a second hearing. (The court could not resolve the contempt
issues because Don Bowers failed to appear at the February 10, 2009 hearing, and Mr. Frails was
not available to testify.) Accordingly, the court ordered Donald Bowers, Lonny Bowers and
Randolph Frails to appear by telephone at a June 3, 2009 hearing to address the contempt issues.
(<u>See</u> Apr. 27, 2009 Order (Docket No. 1560) at 3, 9.)

**<u>June 3, 2009 Hearing on First OSC</u>**

On June 3, 2009, the court held an evidentiary hearing to determine whether it should find
*pro se* Defendant Lonny Bowers, *pro se* Interested Party Randolph Frails, and *pro se* Donald
Bowers in contempt for alleged violation of the court's June 26, 2008 Order (including the
court's mandate to cease any activity that would encumber certain WideBand Massachusetts
assets, and a related discovery mandate) and alleged fraud on the court. (<u>See</u> May 1, 2009 Am.
Order (Dkt # 1567); Feb. 24, 2009 Order (Dkt # 1475); Jan. 26, 2009 OSC (Docket No. 1407).)
All three individuals appeared by telephone.

Mr. Frails, when questioned about the purported April 2008 Loan Agreement and
Security Agreement, testified that he did not draft the documents and that the first time he had
seen them was in October 2008. (June 3, 2009 Hr'g Tr. (Docket No. 1672) at 53, 57; <u>see also</u>
May 27, 2009 Aff. of Randolph Frails (Docket No. 1633) ¶ 9.) He further testified that if he had

been aware of the April 2008 documents when the court directed him in June 2008 to produce all documents related to the asset purchase agreement he would have done so. (June 3, 2009 Hr'g Tr. at 66.)

Mr. Donald Bowers testified that he caused the November 6, 2008 UCC-1 Financing Statement to be filed with the State of Massachusetts. (Id. at 74-75, 76 78 ("I filed a security agreement to secure my loan [to WideBand Massachusetts].").) He then volunteered information that the UCC filing had been terminated on March 17, 2009. (Id. at 76-77; see also Ex. 12 of June 3, 2009 H'rg Binder (filed with the court by Lonny Bowers on May 22, 2009) (UCC Filing History for Secured Party Donald D. Bowers, printed out on May 19, 2009 from State of Massachusetts Secretary of State Corporations database) (listing "UCC-3 Termination" for the very same UCC-1 Financing Statement at issue in First OSC).)[12] He then claimed that because there were no WideBand Massachusetts assets to recover he had terminated the UCC lien. (June 3, 2009 Hr'g Tr. at 81.)

At the close of the hearing, the court took the matter under advisement. (Id. at 103-04.)

_____

[12]The court notes that the First OSC (which concerned the UCC filing) was issued on January 26, 2009. A hearing on the First OSC was held on February 10, 2009. Despite being ordered to appear, Donald Bowers did not do so. A second hearing was scheduled (with notice to Donald Bowers) for March 13, 2009. (See Feb. 24, 2009 Order (Docket No. 1475).) On March 4, 2009, the court vacated the March 13, 2009 OSC hearing and stated that a new hearing would be re-scheduled at a time yet to be determined. (Docket No. 1490.) On March 30, 2009, ClearOne filed an *Ex Parte* Motion to Reschedule Hearing on Orders to Show Cause (Docket No. 1506). The court ultimately granted the *ex parte* motion, scheduling and holding the June 3, 2009 hearing. (See Apr. 28, 2009 Order (Docket No. 1560).) At no point before June 3, 2009 hearing did the court receive any information from Donald Bowers that the UCC-1 Financing Statement had been terminated.

# CONCLUSIONS OF LAW

## DONALD BOWERS

### Jurisdiction

As an initial matter, Donald Bowers contends that the court does not have jurisdiction

over him because he is not located in Utah and is not a party to the litigation.

Non-parties who reside outside the territorial jurisdiction of a district court are subject to

that court's jurisdiction if, with actual notice of the court's order, they directly violate an order or

actively aid and abet a party in violating the court's order. This is so despite the absence of other

contacts with the forum. See Fed. R. Civ. P. 65(d)(2)(c) (injunctive order binds "persons who

are in active concert or participation" with the parties and "who receive actual notice" of order);

Reliance Ins. Co. v. Mast Constr. Co., 159 F.3d 1311, 1317 (10th Cir. 1998) (recognizing that

non-party may be subject to court's jurisdiction under Fed. R. Civ. P. 65(d) in contempt

proceedings); SEC v. Homa, 514 F.3d 661, 673 (7th Cir. 2008); Waffenschmidt v. MacKay, 763

F.2d 711, 714 (5th Cir. 1985).

Contrary to Donald Bowers' assertions, he is indeed subject to the June 2008 Order and

the court's contempt jurisdiction. As established by the facts above (and as discussed below),

when Donald Bowers filed the UCC-1 Financing Statement on November 6, 2008, he was a

person "in active concert or participation" with the WideBand Defendants. The court's

conclusion is primarily, although not exclusively, based on the purported security agreement he

had with the WideBand Defendants as well as his business and personal relationship with Lonny

Bowers and WideBand Massachusetts, both of whom had been found liable the day before the

filing. Accordingly, the court holds that it has jurisdiction over Donald Bowers for purposes of

these contempt proceedings.

## Civil Contempt Standard

Under federal law, the court has the "power to punish by fine or imprisonment, at its discretion, . . . contempt of its authority . . . [including, d]isobedience or resistance to its lawful writ, process, order, rule, decree or command." 18 U.S.C. § 401 (2009).

To succeed on its motion for an order finding Donald Bowers in civil contempt, ClearOne must prove, by clear and convincing evidence, that (1) the June 26, 2008 Order was valid and enjoined conduct in reasonable detail (i.e., was sufficiently specific when defining the conduct enjoined); (2) Donald Bowers had actual knowledge of the Order through personal service or otherwise and was subject to it; and (3) Donald Bowers disobeyed the order. See, e.g., Reliance Ins. Co., 159 F.3d at 1315-16. Also, because ClearOne is seeking damages, it must establish (again, by clear and convincing evidence), that it was damaged by the conduct. Id.

## The June 2008 Order Was Valid and Sufficiently Clear.

No one disputes the validity of the June 2008 Order.[13] And the court finds that it was sufficiently clear in defining what conduct was prohibited.

When considering whether the injunction was sufficiently specific, the court should look at the injunctive order as a whole, including not only its text but also the context of the litigation. Reliance Ins. Co., 159 F.3d at 1316; see also Drywall Tapers & Pointers, Local 1974 v. Local 530 of Operative Plasterers & Cement Masons Int'l Ass'n, 889 F.2d 389, 395-96 (2d Cir. 1989)

---

[13]Of course the WideBand Defendants take issue with the conclusions in the Order, but that is not what the court means by "validity." Nothing in the record supports a finding that the court did not have authority to issue the June 2008 Order.

(defendant's conduct can demonstrate lack of ambiguity in injunctive order).

> Rule 65(d) requires only that the enjoined conduct be described in reasonable, not excessive, detail—particularly in cases like this when overly precise terms would permit the very conduct sought to be enjoined. <u>See</u> <u>Scandia Down Corp. v. Euroquilt, Inc.</u>, 772 F.2d 1423, 1431-32 (7th Cir. 1985) (Rule 65(d) "does not require the impossible. There is a limit to what words can convey . . . . The right to seek clarification or modification of the injunction provides assurance, if any be sought, that proposed conduct is not proscribed.").

<u>Reliance Ins. Co.</u>, 159 F.3d at 1316-17.

Here, there can be no genuine doubt about what the order prohibited. In addition to the clear language of the Order, the court held four separate hearings concerning issuance of the June 26, 2008 Order. And ClearOne filed a separate fraudulent transfer action against WideBand Georgia and Don Bowers based on the original asset purchase agreement. Don Bowers, through his attorney, even purported to rescind the entire asset transfer transaction because of the court's concern. Yet he illogically distinguishes in his mind the asset transfer agreement and the purported April 2008 Security Agreement.[14] Such self-denial does not excuse his actions or allow him to claim ignorance.

**<u>Donald Bowers Had Notice of the June 2008 Order and First OSC.</u>**

"[P]ersonal service should not become a degrading game of wiles and tricks nor should a defendant be able to defeat service simply by refusing to accept the papers[.]" <u>Reliance Ins. Co.</u>,

---

[14]The court does not reach the issue of whether the April 2008 loan and security agreement documents were forgeries created to justify the UCC filing. The record does not support by clear and convincing evidence that the documents were falsified. If anything, it appears, although the court does not make any such finding, that Mr. Bowers withheld the documents (and information concerning the transaction) because of his overriding interest in protecting his financial status. If that is what occurred, then this contempt order encompasses such action by voiding any such secured transaction.

159 F.3d at 1318 (internal citation and quotations omitted).

Donald Bowers had actual notice of the June 2008 Order. An injunction is binding on nonparties "'who receive actual notice of the order by personal service or otherwise.'" Reliance Ins. Co., 159 F.3d at 1317 (quoting Fed. R. Civ. P. 65(d)). Throughout the hearings concerning ClearOne's June 2008 TRO motions, Donald Bowers was represented by counsel. The June 26, 2008 Order was also personally served on him. (See July 8, 2008 Return of Service (Docket No. 917) (proving June 30, 2008 personal service of D. Bowers at home).) He had notice.

The court finds Donald Bowers' testimony during the June 3, 2009 OSC hearing (i.e., that he had not seen the June 26, 2008 order until the morning of that hearing) thoroughly unconvincing. Furthermore, Donald Bowers' convenient claim of ignorance (i.e., that he did not believe the order applied to him) was equally unconvincing, especially in light of the series of hearings held in 2008 relating to the asset purchase agreement to which he was a central party, the clarity of the order that resulted from those hearings, and his 2008 rescission of the Asset Purchase Agreement.

As for the First OSC, and the order to appear in February 2009, Donald Bowers had sufficient notice of the February 10, 2009 OSC hearing despite his failure to appear. He would have been properly served on January 28, 2009, if he (through his wife) had not avoided service that day (which was fourteen days before the scheduled hearing). See, e.g., Reliance Ins. Co., 159 F.3d at 1318-19 ("[I]t is well-settled that the effect of a written notice cannot be avoided by refusing service of that notice."). Moreover, even if he did not receive notice until June 7, 2009 (although the record and law support a finding that he was served with the papers before then), he did not contact the court in any manner or request a new hearing date. Instead, there was silence.

**Donald Bowers Knowingly Disobeyed the June 2008 Order.**

When Donald Bowers finally appeared, he admitted that he filed (or caused to be filed) the UCC-1 Financing Statement in the State of Massachusetts on November 6, 2008, to protect his secured interest in WideBand Massachusetts' assets, including intellectual property. (June 3, 2009 Hr'g Tr. (Docket No. 1672) at 75-76; Ex. 12 of June 3, 2009 H'rg Binder (UCC Filing History for Secured Party Donald D. Bowers).) He said he wanted to recoup the money he had loaned to the WideBand Defendants and said that "part of the initial documentation that we had . . . required that I file it, so I filed it." (June 3, 2009 Hr'g Tr. at 75-76.).

Mr. Bowers' disobedience need not be "willful" to constitute civil contempt. Bad Ass Coffee Co. of Hawaii, Inc. v. Bad Ass Coffee Ltd. P'ship, 95 F. Supp. 2d 1252, 1256 (D. Utah 2000) (citing Goluba v. School Dist. of Ripon, 45 F.3d 1035, 1037 (7th Cir. 1995)). "Indeed, a district court is justified in adjudging a person to be in civil contempt for failure to be reasonably diligent and energetic in attempting to accomplish what was ordered." Id.

The court has no doubt that Donald Bowers knew of the June 2008 Order, because of his role and participation in this case (both through his attorney Randolph Frails and his son Lonny Bowers), and because he was personally served with the order.

He cannot credibly claim ignorance of the June 2008 Order or its meaning. The purpose of the Order was clear – it was to prevent exactly the type of attempted transfer or encumbrance of assets reflected in the November 6, 2008 UCC-1 Financing Statement. It specifically precluded "any . . . action" to "convey, transfer, encumber or pledge ownership in any or all of the Disputed Codes," as follows:

The WideBand Defendants will take no further action in connection with any sale

or transfer of ownership of the following of the WideBand Defendants' assets to WideBand Georgia or any other person or entity: the FC101 code, the WC301 code, the WC301 code, the WC301A code, the Biamp code, the Harman code, and the SimphoniX code, whether consisting of source or object code, as well as the algorithms related thereto (collectively, the "Disputed Codes"). This includes, without limitation, a prohibition upon the execution of any additional documents related to or necessary for the performance of the WideBand Sale Agreement to the extent it effects a sale or transfer of ownership of the Disputed Codes. This further includes, without limitation, any other action to convey, transfer, encumber or pledge ownership in any or all of the Disputed Codes in favor of WideBand Georgia, including, without limitation, the performance of any licensing or other agreements encumbering the Disputed Codes through or in conjunction with WideBand Georgia, even if such agreements were executed prior to the Court's issuance of a temporary restraining order on June 26, 2008. In other words, WideBand Defendants will not allow or assist WideBand Georgia in any efforts to license or to transfer or, convey ownership or otherwise effect in any way any of the Disputed Codes.

(June 26, 2008 Order (Docket No. 908) ¶ 3 (emphasis added).) The court further ordered that "[n]one of WideBand Defendants' profits from the Disputed Code[s] shall be transferred or conveyed to WideBand Georgia." (Id. ¶ 4.) Indeed, he rescinded the Asset Purchase Agreement.

Yet the financing statement sought to perfect a security interest in all of WideBand Massachusetts' assets, including all "software," all "intellectual assets," and "intellectual property," which, in light of the jury's verdict (issued the day before the filing), not only meant the "Disputed Codes" but more specifically the Honeybee Code that the jury found WideBand Defendants had willfully and maliciously misappropriated. There was even less question at that point that WideBand Massachusetts assets included ClearOne's stolen trade secret.

By filing the UCC-1 Financing Statement, Don Bowers encumbered the assets of WideBand Massachusetts, included the intellectual property. The filing of a financing statement with the Massachusetts Secretary of State perfects a security interest under the Uniform Commercial Code. And in order for that filing to be legally valid, it had to have been based upon

an existing written and signed security agreement. See, e.g., Mass. Gen. Laws ch. 106, § 9-203(b) (entitled "Attachment and Enforceability of Security Interest . . . ."). The pledging of the assets and the signing of such security or other agreements granting a security interest, as well as the UCC filing, are direct violations of the court's June 26, 2008 Order. Stated another way, Donald Bowers either withheld the information from the court in 2008 when it clearly should have been disclosed during the TRO proceedings,[15] or he concocted the April 2008 agreements in a short-sighted attempt to justify the UCC filing for which he was facing contempt charges. Either way, he has committed fraud on the court.

For all the above reasons, the court finds that Donald Bowers knowingly violated the June 26, 2008 Order.

Moreover, he cannot avoid a finding of contempt because he apparently withdrew the financing statement. Mr. Bowers says he terminated the financing statement, but he did not do so until his feet were held to the fire by ClearOne. He cannot avoid a finding of contempt by terminating the filing after the First OSC was issued and then profess that he filed the termination because he discovered there was nothing to collect.

Certainly the timing of the termination is questionable because it occurred only weeks after the court issued a February 24, 2009 order setting a hearing on the First OSC for March 13, 2009 (the hearing date was subsequently continued to a later time). (See id. at 78; Feb. 24, 2009 Order (Docket No. 1475).)

---

[15]Donald Bowers argues that it was no secret he was lending money to the WideBand Defendants. But his argument misses the point. The security agreement and using the disputed code as collateral for that loan created the problem, not the loan itself.

But even if the financing statement was terminated on March 17, 2009,[16] Mr. Bowers did not inform ClearOne or the court of that important fact until two and a half months later, during the June 3, 2009 hearing (even though he knew the court and ClearOne were spending resources following up on the First OSC). (June 3, 2009 Hr'g Tr. at 76-77.)

Actions speak louder than words. Donald Bowers could have sought assurance that his filing would not violate the June 2008 Order, but instead he chose to act in a stealthy manner, conveniently filing the financing statement less than twenty-four hours after the jury issued a large verdict against the WideBand Defendants, including his son. And then he withdrew the filing when he got caught. He has attempted to wiggle his way out of the situation. The court will not tolerate such behavior.

**ClearOne Has Been Damaged by Donald Bowers' Contempt.**

"Civil contempt may be used 'to compensate the contemnor's adversary for injuries resulting from the contemnor's noncompliance' with a court order." Reliance Ins. Co., 159 F.3d at 1318 (quoting O'Connor v. Midwest Pipe Fabrications, Inc., 972 F.2d 1204, 1211 (10th Cir. 1992)). Now that ClearOne has established Don Bowers' contempt by clear and convincing evidence, it must prove its damages by a preponderance of the evidence. Id. There is no doubt that, absent Mr. Bowers' filing and recalcitrance, ClearOne would not have incurred attorneys' fees and costs associated with defending its judgment against the secured interest that Donald Bowers was legally barred from creating. Also, his absence caused delay and required a second hearing.

---

[16]The court questions this conclusion because the record consists of an unauthenticated document showing a UCC-3 termination and Mr. Bowers' less-than-convincing testimony.

Accordingly, ClearOne is entitled to payment by Donald Bowers for fees associated with his contempt actions. ClearOne is directed, as set forth below, to submit evidence of the actual amount of damages it suffered, and the court will decide the amount of damages without further hearing.

## THE INDIVIDUAL WIDEBAND DEFENDANTS

As noted at the beginning of this Order, the court finds that the evidence presented during the February 2009 and June 2009 hearings does not rise to the level of clear and convincing evidence that Lonny Bowers, Andrew Chiang, and Jung Yang are in contempt of court in connection with the UCC filing and the April 2008 Loan and Security Agreement documents. There is no evidence that anyone other than Donald Bowers filed the UCC-1 Financing Statement. And while the circumstances surrounding the April 2008 Loan and Security Agreement are murky, there is no affirmative evidence that any of the WideBand Defendants knowingly withheld, or forged, the April 2008 documents. Lonny Bowers claimed under oath, with no contradictory evidence in the record, that he relied on his father and Mr. Frails to send the documents to Karra Porter for disclosure to ClearOne. Despite Ms. Porter's careful and convincing testimony, the fact that she did not receive the April 2008 documents does not prove that any of the WideBand Defendants forged the documents, as ClearOne adamantly urges the court to find. The record points only to Donald Bowers as the source, and keeper, of the documents. Given the high standard of proof, the court is not willing to adopt the inferences supplied by ClearOne as sufficient evidence to support a finding of contempt against the individual defendants.

**ORDER**

For the foregoing reasons, the court hereby holds that DONALD BOWERS IS IN CIVIL CONTEMPT OF COURT for violating the June 26, 2008 Order by filing the November 6, 2008 UCC-1 Financing Statement and for failing to appear at the February 10, 2009 hearing despite receiving notice of a mandate to appear in the court's First OSC. Accordingly, the court ORDERS as follows:

1.      To the extent the November 6, 2008 UCC-1 Financing Statement filing was not actually terminated, the court holds that such filing is null and void *ab initio*.

2.      The court declares the April 2008 Loan Agreement and April 2008 Security Agreement null and void *ab initio*.

3.      **ClearOne is entitled to receive its reasonable attorneys' fees and costs incurred in pursuing the First OSC against Donald Bowers.** ClearOne shall submit an affidavit and documentation of the costs and attorneys' fees as soon as practicable but no later than thirty days from entry of this Order, after which the Magistrate Judge shall issue a ruling awarding those costs and fees reasonably incurred in relation to the First OSC. **The amount of any award as to the First OSC shall be reduced to a judgment in favor of ClearOne against Donald Bowers (the "Contempt Judgment").** The fees and costs, if reasonable and documented, will be awarded to compensate ClearOne for its direct losses incurred in bringing the actions of Donald Bowers to the attention of the court and obtaining the relief granted herein.

4.      To the extent the Contempt Judgment is not paid by Mr. Bowers within fifteen (15) days of the date of the Magistrate's Order, it will be augmented by the attorneys' fees and costs incurred by ClearOne in attempting to enforce and/or collect on the Contempt Judgment,

after application by ClearOne to the court, and court approval of such augmentation.

5.      The Contempt Judgment may be registered in a foreign district pursuant to 28 U.S.C. § 1963, immediately upon its entry.

**6.      Donald Bowers shall and is ordered to do the following:**

a.      Within fourteen (14) days of the date of this Order, provide a notarized affidavit or declaration sworn under penalty of perjury certifying that he has caused the cancellation or withdrawal of the November 6, 2008 UCC-1 Financing Statement filing;

b.      Within fourteen (14) days of the date of this Order, provide a notarized affidavit or declaration sworn under penalty of perjury stating that he understands the court's order invalidating the Loan Agreement and Security Agreement, and that he will not, directly or indirectly, attempt to enforce any security agreement against any assets of WideBand Massachusetts.

c.      Within fourteen (14) days of the date of this Order, terminate (i) any security interest, (ii) any filing documenting such security interest, or (iii) similar formalization of a security interest in the assets of WideBand Massachusetts. This includes any documentation filed or generated in his name or on his behalf, or in the name of (or on behalf of) WideBand Georgia, or filed or generated for any other individual or entity over which Donald Bowers exerts control. This includes any filing made by him or made at his direction through his agents or those acting in concert with him (including, without limitation, his wife, son, attorney, corporation or any other entities or individuals known or unknown to the court).

d.      Within fourteen (14) days of the date of this Order, provide a notarized affidavit or declaration sworn under penalty of perjury stating that there are no additional

documents in existence which grant any security interest in any of WideBand Massachusetts' assets or the property in dispute in this case, in favor of Donald Bowers or WideBand Georgia.

       **e.**      **Failure by Donald Bowers to do these things within the time ordered shall result in a fine of $100 per day, until Donald Bowers has complied with this court's Order or demonstrated, in good faith, an inability to pay.**

       7.      Donald Bowers is ordered to **pay the Contempt Judgment to be entered in favor of ClearOne within fifteen (15) days of its entry**, or to appear personally before the court within fifteen (15) days of entry to provide evidence demonstrating his inability to pay the Contempt Judgment. **Failure to do so within the time ordered will result in an additional fine of $100 per day until Donald Bowers either pays the Contempt Judgment or appears before the court, in good faith, as noted above.**

       8.      Donald Bowers is ordered not to transfer, encumber, or pledge any assets in a fashion to defeat the collection of the Contempt Judgment entered against him.

       9.      **The court will consider <u>any</u> knowing violation of this order by Donald Bowers <u>(including failure to comply with deadlines)</u> to be another act of contempt, and the court will (a) bring Donald Bowers before the court, through <u>issuance of a bench warrant</u>, to answer for his contempt; (b) <u>issue an order of incarceration</u> of Donald Bowers until the contempt is cured; and (c) <u>refer the matter to the United States Attorney's Office for criminal prosecution of Donald Bowers</u> under 18 U.S.C. § 401 and Federal Rule of Criminal Procedure 42.**

       10.     In addition to the regular service the Clerk of the Court will provide to Donald Bowers, ClearOne is hereby ordered to provide Donald Bowers with notice of this Order as soon

as possible by way of electronic mail as set forth in the court's August 5, 2009 Order (Docket No. 1819) at p. 6 ¶ 20.

DATED this 3rd day of September, 2009.

BY THE COURT:

TENA CAMPBELL
Chief Judge