IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| CLEARONE COMMUNICATIONS, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>ANDREW CHIANG; JUN YANG; LONNY BOWERS; WIDEBAND SOLUTIONS, INC. (a Massachusetts corporation); VERSATILE DSP, INC.; and BIAMP SYSTEMS CORPORATION,<br><br>Defendants. | MEMORANDUM DECISION<br><br>AND<br><br>ORDER OF CONTEMPT<br><br>Case No. 2:07-CV-37-TC |

This highly acrimonious and heavily litigated trade secret misappropriation case concerns the theft of Plaintiff ClearOne Communications, Inc.'s teleconferencing digital signal processing software (the "Honeybee Code"). Now, a year after the jury issued a verdict for ClearOne (which was followed by the court's final judgment and permanent injunction), the matter has resulted in several contempt proceedings against certain Defendants and interested parties who continue to possess and use the stolen Honeybee Code while steadfastly attempting to hide their repeated violations of the court's Preliminary Injunction and other pre- and post-trial orders.

In June and October 2009, the court issued two related orders to show cause,[1] in which

---

[1]The OSCs were prompted by ClearOne's separate but related motions for such orders.

the court demanded that the WideBand Defendants[2] and third-parties Donald Bowers,[3] David

Sullivan, WideBand Georgia,[4] and DialHD, Inc. show good cause why they should not be held in

civil contempt for violation of the court's permanent injunction and post-judgment TRO.

Now, having considered the evidence presented at the two hearings, and for the reasons

set forth below, the court finds that ClearOne has not shown by clear and convincing evidence

that Andrew Chiang, Versatile, WideBand Georgia, and David Sullivan are in contempt of court.

But, ClearOne has shown by clear and convincing evidence that Lonny Bowers, Jun Yang,

WideBand Solutions of Massachusetts ("WideBand"), and third-party collaborator DialHD, Inc.

(collectively the "Contemnors") are in contempt of court for violation of the court's April 2009

Permanent Injunction and August 2009 Temporary Restraining Order for selling WideBand's

Simphonix Si-400 product in the guise of DialHD's AEC4 and HD4551 products, all of which

contain the Honeybee Code. Not only are the Contemnors ordered to pay attorneys' fees and

damages sustained by ClearOne as a result of their contemptuous behavior, but they are required

to perform certain acts set forth below in order to purge themselves of their contempt. If they do

not purge their contempt in the manner and by the time set forth below, they face coercive

incarceration.

---

[2]The WideBand Defendants consist of Lonny Bowers, Jun Yang, Andrew Chiang, WideBand Solutions, Inc. (a Massachusetts corporation), and Versatile DSP, Inc. Defendant Biamp Systems Corporation is not involved in any way in this contempt proceeding.

[3]The first OSC included Donald Bowers, but the second OSC does not reach him personally because by the time it was issued, he was (and currently is) in bankruptcy and the automatic stay has not been lifted. See In re Donald D. Bowers, Case No. 1:09-BK-12301 (United States Bankruptcy Court for the Southern District of Georgia).

[4]The full name of the company is WideBand Solutions, Inc., a Georgia company.

# I. FINDINGS OF FACT[5]

## A.    Jury Verdict, Permanent Injunction, and TRO

On November 5, 2008, after a two-week trial, the jury issued its special verdict finding that all of the defendants had wilfully and maliciously misappropriated ClearOne's Honeybee Code trade secret.  (See Docket No. 1286.)  The jury awarded ClearOne more than ten million dollars in compensatory and punitive damages.

Based on the jury's verdict, and as part of the court's final judgment against the Defendants, the court issued its Permanent Injunction on April 8, 2009.  The Court's April 2009 Permanent Injunction expressly restricts, in clear terms, any continued use of the intellectual property that was the subject of the trial, including WideBand's Simphonix Product:

> Each of the WideBand Defendants—Andrew Chiang, Jun Yang, Lonny Bowers, WideBand Solutions, Inc. ("WideBand"), and Versatile DSP, Inc.—is hereby permanently enjoined from ***disclosing, using or transferring in any way*** the trade secret owned by Plaintiff ClearOne Communications, Inc., called the **Honeybee Code** (including its unique algorithms or sub-algorithms that are not in the public domain), whether in the form of source code, object code, or any other form, and ***any code or product substantially derived from the Honeybee Code***.
>
> . . . .
>
> Each of the WideBand Defendants is also permanently enjoined from disclosing, using, or transferring in any way the product development documentation for the Honeybee Code or any other documentation that reveals the contents of the Honeybee Code.
>
> Because the following "Infringing Products" contain or are substantially

---

[5]The court makes its findings of fact in compliance with rule 52(a) of the Federal Rules of Civil Procedure.  See Federal Trade Comm'n v. Kuykendall, 371 F.3d 745, 760 (10th Cir. 2004) ("[I]n a contempt proceeding, a district court must follow the strictures of Federal Rule of Civil Procedure 52(a) and provide findings of facts upon which it bases its judgment sufficient to make possible meaningful appellate review.").

derived from the Honeybee Code, they are also subject to the permanent injunction: the AEC2W object code licensed to Biamp Systems Corporation (the Biamp Code); the computer code licensed to Harman Music Group, Inc. that was the subject of the October 30, 2007 Preliminary Injunction Order (the Harman Code); WideBand's FC101 product; WideBand's WC301 product; WideBand's WC301A product; and ***WideBand's Simphonix product***.

The restrictions listed above include, without limitation, a restriction upon any further **marketing**, **selling**, **manufacturing**, **development**, **modification**, **duplication**, or **transport** or **delivery** of technology containing the Honeybee Code or **any product substantially derived from the Honeybee Code**. These restrictions also include, without limitation, a restriction upon any further marketing, selling, delivery, and/or use of technology or products containing the Honeybee Code to service any past or existing customers.

The restrictions set forth immediately above apply not only to each of the WideBand Defendants, but also to each of WideBand Defendant's agents, servants, officers, employees, entities, ***and those acting in concert with them***, and/or those acting under their direction or control, to the fullest extent allowed by law.

(Apr. 8, 2009 Permanent Injunction at 1-3 (emphases added) (Docket No. 1525).)

In July 2009, the court received evidence, culminating in a July 31, 2009 hearing, that certain Defendants and a third-party named DialHD, Inc. (acting in concert with certain Defendants) were surreptitiously selling products utilizing the Honeybee Code, all in violation of the court's Permanent Injunction. Essentially, DialHD, along with Lonny Bowers and others, was selling products called the AEC4 that were simply a repackaged Simphonix product banned by the court's Permanent Injunction.

At the end of the July 31, 2009 hearing, the court issued a temporary restraining order, noting as follows:

I BELIEVE, AND I AM CONFIDENT, THAT THE INFORMATION AND EVIDENCE THAT I HAVE HEARD TODAY SHOWS THAT THERE IS A SUBSTANTIAL LIKELIHOOD THAT CLEARONE WOULD PREVAIL ON THE QUESTION OF WHETHER THE PRODUCTS THAT ARE AT ISSUE

HERE ARE IN FACT EMPLOYING THE HONEYBEE CODE. THAT
BURDEN HAS BEEN MET. AND GIVEN THE EVIDENCE THAT I HAVE
BEFORE ME, CLEARLY THE IRREPARABLE HARM THAT CLEARONE
WOULD SUFFER IF THE ASSETS WERE TRANSFERRED. AGAIN, THIS
T.R.O. MUST ISSUE. NOW, IT'S NARROWLY TAILORED TO THE ONLY
TWO PRODUCTS. . . . HOWEVER, GENTLEMEN, I TELL YOU THAT **IF I
HAVE EVIDENCE THAT IN THE INTERIM *ANY* OF THESE
PRODUCTS *ARE SOLD OR TRANSFERRED*, I WILL VIEW THAT AS
CONTEMPT WORTHY OF CRIMINAL PROSECUTION**.

(July 31, 2009 Hr'g Tr. at 174-75 (emphases added).)  On August 5, 2009, the court formalized

its oral ruling by entry of a written Temporary Restraining Order and Order from July 31, 2009

Hearing (the "TRO").  (See generally TRO (Docket No. 1819).)

Among other things, the written TRO repeated the court's finding that ClearOne had

shown a substantial likelihood of success on the merits, as follows:

> 7.     ClearOne has shown a substantial likelihood of success on the
> merits on its TRO request with regard to the sale and/or marketing of the **DialHD
> products sometimes identified as the "AEC4" and the "Mix-4" or
> "Automixer," including not only the physical products but also all firmware,
> software, accessories, installation materials, and support materials (the
> "DialHD Infringing Products")**, including as reflected in Exhibit Nos. 10, 11,
> and 12, marked at the July 31, 2009 hearing.  More specifically, ClearOne has
> demonstrated a substantial likelihood of success on the merits of its claim that the
> **DialHD Infringing Products illegally utilize the Honeybee Code in the same
> or similar fashion to those "Infringing Products" identified in the Court's
> Order Granting Permanent Injunction.** [See Docket No. 1524 at 12 (defining
> "Infringing Products" that "illegally utilize the Honeybee Code")].

(TRO ¶ 7.)  The TRO also expressly prohibited any further marketing or sale of the "DialHD

Infringing Products," including in particular the AEC4. (Id.)  Of course the court's earlier orders,

including the Permanent Injunction, remained in effect.  In essence, the August 5, 2009 TRO is

an expansion of the content and spirit of the April 2009 Permanent Injunction.

Before getting into the facts constituting contempt, the court provides a brief background

about the relevant technology to provide context for understanding the events that have occurred since the inception of this case.

**B.     The Honeybee Code Trade Secret**

ClearOne's trade secret is called the Honeybee Code, which was designed to enhance sound quality in audio conferencing equipment.  It contains audio digital signal processing (DSP) algorithms and computer code.  (See Oct. 20, 2008 Trial Tr. [hereinafter Oct. 20 Tr.] at 111-12 (programmers have developed audio DSP algorithms to enhance sound quality in audio conferencing); see also Trial Ex. 571.)  Examples of audio DSP algorithms are acoustic echo cancellation ("AEC") and noise filtration.

An algorithm—which often serves as the basis for computer programming—is a series of commands designed to accomplish a specific task.[6]  (Oct. 20 Tr. at 136-37 (witness Tracy Bathurst, ClearOne's Chief Technical Officer).)  Because an algorithm dictates a specific order of inquiries, different algorithms could achieve the same result even if the inquiries are in a different order.  There are many choices, even in the most simple of algorithms, and there are no set rules for making those choices; different developers, even from the same company, would not come up with the same algorithm to solve the same problem.  (Id. at 139-40; Oct. 20 Tr. at 95-96 (witness Tracy Bathurst); Oct. 22, 2008 Trial Tr. [hereinafter Oct. 22 Tr.] at 94, 128 (expert witness Thomas Makovicka).)

An algorithm may be depicted in different ways, including in a block or flowchart form, a

_____

[6]The steps necessary to resolve a non-functioning lamp problem present an example of a very simple algorithm.  Step one: determine if the lamp is plugged in.  If yes, step two: replace the bulb.  If still not functioning, step three: purchase a new lamp.  (Oct. 20 Tr. at 136; Trial Ex. 505 (demonstrative).)

text or instruction-like form (whether in, e.g., English, Spanish, French, or German), source (or assembly) code (e.g., the programming language called C code),[7] or object (machine) code. (Oct. 20 Tr. at 142-48, 150; see also Trial Ex. 506 (demonstrative chart depicting different representations of the same algorithm).)

When designing software, a programmer will usually start with a schematic diagram—a flowchart—of the algorithm. (Oct. 20 Tr. at 137.) At this stage, the programmer will develop the architecture, and specify the functional blocks and design parameters. Once the flowchart is complete, the algorithm is generally converted into source code, which programmers are able to read and understand. (E.g., id. at 144-45, 237.) Often the source code is then converted into object code or machine code, which the computer can read and understand. (Id. at 145-46; Oct. 22 Tr. at 165-66.) Software known as a "compiler" is frequently used to convert the source code into object code. In this conversion, the compiler will remove the parts of the source code which the programmers could understand, leaving only code which is extremely difficult for a human to decipher. (Oct. 20 Tr. at 146-50; Oct. 21, 2008 Trial Tr. [hereinafter Oct. 21 Tr.] at 245 (witness Tracy Bathurst); Oct. 22 Tr. at 165-67.)

ClearOne and its predecessors (including "Old ClearOne") used the Honeybee Code in their DSP products, such as the ClearOne speaker phone. (E.g., Oct. 20 Tr. at 28, 30, 155, 160.) Defendant Jun Yang was a software and signal processing engineer with Old ClearOne. (E.g., Oct. 24, 2008 Trial Tr. [hereinafter Oct. 24 Tr.] at 141-42, 204, 227-28.) Defendant Andrew

---

[7]C code is a higher-level computer programming language that is more human and portable (i.e., independent of the computer chip it will be placed on). (E.g., Oct. 20 Tr. at 144-45, 237.)

Chiang also worked with Old ClearOne.

**C.**     **Procedural Background**

In January 2007, Plaintiff ClearOne Communications, Inc. (ClearOne) filed a complaint against the WideBand Defendants alleging, among other things, misappropriation of ClearOne's trade secret, the Honeybee Code. What followed is a tortured procedural history, including issuance of two temporary restraining orders (TROs), a preliminary injunction, expansion of the preliminary injunction, multiple orders to compel pre-trial and post-trial discovery, sanctions orders, a formal finding of perjury, a two-week trial, multiple contempt proceedings, numerous post-trial and post-judgment motions, and now bitter accusations of fraud, sordid gamesmanship, and evidence of post-trial machinations that led to ClearOne's request to refer this matter to the United States Attorney's Office for prosecution of criminal contempt charges. This order sets forth the more egregious events to provide context as well as to provide evidence supporting the court's finding of civil contempt for multiple violations of the Permanent Injunction and August 2009 TRO.

    **1.**     **Pre-Trial Events**

        a.     The October 30, 2007 Preliminary Injunction

As noted above, in January 2007, ClearOne began this lawsuit against the WideBand Defendants and Biamp. By February of 2007, WideBand informed Harman—a prospective client—of this suit, but the two entities continued in negotiations for WideBand to license its acoustic echo cancellation technology to Harman. On July 26, 2007, WideBand and Harman consummated the licensing agreement, expressing that Harman "desires WideBand to develop AEC Technology specific to [Harman]'s intended application (the source code for which will be

owned by WideBand and will constitute trade secret technology of WideBand), and to thereafter license to [Harman] the machine/object code for the same . . . ." (License Agreement, ¶ 1.3, attached as Ex. 10 to Pl.'s Mem. Supp. of Mot. for Prelim. Inj. (Docket No. 345-2).)

After an emergency TRO hearing, the court found that ClearOne had demonstrated a substantial likelihood that the Harman Code and Algorithms were derived from the Honeybee Code. Accordingly, on October 30, 2007, the court issued a Preliminary Injunction preventing WideBand and Harman from following through on the agreement. (See Docket No. 572.)

b.     Sanctions and Adverse Jury Instruction

On June 4, 2007, ClearOne filed a Motion for Sanctions relating to false answers provided by Dr. Jun Yang to deposition questions regarding the production of certain source code and the existence of other versions of the source code containing programmer "comments." After further briefing and a second deposition of Dr. Yang, Magistrate Judge Nuffer entered an "Order Granting in Part [ClearOne's] Motion for Sanctions" on March 9, 2008, stating that "[t]he trier of fact in this case should be instructed" they "may consider that the court has found that Dr. Jun Yang did not answer some questions truthfully under oath in his deposition related to the existence of comments to the Wideband source code." (Docket No. 779.)

Specifically, Judge Nuffer concluded that ClearOne was entitled to an adverse jury instruction, stating, in essence, that:

> Parties in civil cases such as this have obligations to provide information in response to requests from the other party, and to answer questions truthfully under oath in depositions, where parties may ask questions [of] witnesses. Dr. Jun Yang did not answer some questions truthfully under oath in his deposition related to the existence of comments to the WideBand source code. This is serious interference with the truth-seeking process in the case and evidences the risk that parties may not be entirely trustworthy. You are the sole judges of credibility of

parties and witnesses, but you may consider that the court has found that Dr. Jun Yang did not answer some questions truthfully under oath in his deposition related to the existence of comments to the WideBand source code.

(Id. at 12.) On May 15, 2008, the court affirmed Judge Nuffer's order and specifically upheld the grant of the adverse jury instruction but stated that the "exact wording of the instruction will not be finally determined until trial." (Docket No. 860 at 1.) The May 15, 2008 Order stated "the court will instruct the jury that among other things, Dr. Yang was not truthful in his sworn deposition in this action and that his dishonesty may be used in weighing his credibility." (Id. at 2.)

During the October/November 2008 trial, the court read the adverse jury instruction concerning Dr. Yang's perjury to the jury, right before Dr. Yang testified.[8] The adverse instruction, in its final version, was read to the jury as follows:

THE COURT: ALL RIGHT. I WANT TO TELL YOU AN INSTRUCTION. PARTIES IN CIVIL CASES SUCH AS THIS HAVE OBLIGATIONS TO PROVIDE INFORMATION IN RESPONSE TO REQUESTS FROM THE OTHER PARTY AND TO ANSWER QUESTIONS TRUTHFULLY UNDER OATH IN DEPOSITIONS WHERE PARTIES MAY ASK QUESTIONS OF WITNESSES. DR. JUN YANG DID NOT ANSWER SOME QUESTIONS TRUTHFULLY REGARDING -- RELATED TO THE EXISTENCE OF COMMENTS TO THE WIDEBAND SOURCE CODE UNDER OATH IN HIS DEPOSITION. YOU ARE THE SOLE JUDGES OF CREDIBILITY OF PARTIES AND WITNESSES, BUT YOU MAY CONSIDER THAT THE COURT HAS FOUND THAT DR. JUN YANG DID NOT ANSWER SOME QUESTIONS TRUTHFULLY UNDER OATH IN HIS DEPOSITION RELATED TO THE EXISTENCE OF COMMENTS TO THE WIDEBAND SOURCE CODE.

(Oct. 24, 2008 Trial Tr. at 226 (Docket No.1352).)

---

[8]Counsel for the WideBand Defendants filed a motion *in limine* in an attempt to control the timing of the adverse jury instruction. (See Docket No. 1046.) The court denied that motion. (See Docket No. 1224 at 2, ¶ 9.)

<u>TRO Regarding Asset Sale</u>

In the meantime, on June 17, 2008, months before trial, ClearOne filed a Motion for a

Temporary Restraining Order and Preliminary Injunction Regarding Asset Disposition (the

"TRO Motion").  The TRO Motion was brought in response to a transaction between Defendant

WideBand Massachusetts ("WideBand") and WideBand Georgia.  Donald Bowers, Lonny

Bowers's father, was the principal owner of WideBand Georgia.

The transaction concerning ClearOne was at least partially reflected in a document titled

"Agreement for Purchase and Sale of Business Including its Equipment, Software, and All Other

Applicable Intellectual Property" (the "WideBand Sale Agreement").  (At that time, Donald

Bowers was loaning a substantial amount of money to the WideBand Defendants (including the

corporate defendants WideBand and Versatile DSP, Inc.) to pay their legal fees, and the

Agreement was somehow connected to his ability to collect on the debt.)

The TRO Motion sought certain orders from the court to stop the transaction reflected in

the WideBand Sale Agreement, or to the greatest extent possible, stop any further performance of

that transaction by WideBand, Andrew Chiang, Jun Yang, Lonny Bowers and Versatile DSP, Inc.

At that stage in the litigation, the court had already found, through the 2007 preliminary

injunction hearing and order, that ClearOne had established a likelihood of success on the merits,

including a preliminary finding that the source and object code held by the WideBand

Defendants was indeed ClearOne's protected trade secret, the Honeybee Code.  (<u>See, e.g.</u>, June

20, 2008 Hr'g Tr. (Docket No. 925-2) at 3 ("[In 2007,] I found that ClearOne had demonstrated

substantial likelihood that the Biamp code and algorithms were derived from the Honeybee. . . .

And anyone even a little bit familiar with this litigation knows that my [2007 preliminary

injunction] order went through and specifically traced the Biamp Code to the Honeybee Code. I mean there was no question."); June 18, 2008 Hr'g Tr. (Docket No. 894) at 9 (acknowledging findings and expressing concern that court's order may have been violated); Oct. 30, 2007 Prelim. Inj. (Docket No. 572) (barring transfer of any intellectual property or products containing the Honeybee Code).)

During the June 18, 2008 hearing, based on the representation of Donald Bowers's attorney Randolph Frails that the language of the WideBand Asset Purchase Agreement excluded sale of the code addressed by the court's 2007 injunction, the court denied ClearOne's June 18, 2008 TRO motion. (See Tr. of June 18, 2008 Hr'g on TRO Mot. (Docket No. 894).) But the court ordered the parties to disclose information confirming the nature of the transaction. (See id. at 22; June 18, 2008 Minute Entry (Docket No. 911).)

The next day, ClearOne (who by then had received a copy of the WideBand Asset Purchase Agreement) filed a renewed Motion for TRO and preliminary injunction because, contrary to Mr. Frails's representations,[9] the terms of the agreement did transfer intellectual

_____

[9]Mr. Frails's representations turned out to be inaccurate. But the court did not find that Mr. Frails committed perjury during the June 18, 2008 hearing. The court noted, however, that at a minimum, the individuals charged with the responsibility to adhere to the court's 2007 injunction (the WideBand Defendants, Mr. Donald Bowers, and Mr. Frails) failed in their responsibility to conduct due diligence and then draft and execute conforming documents. See June 20, 2008 Hr'g Tr. (Docket No. 925-2) at 3-4 ("I mean there was no question [about the contents of the court's 2007 preliminary injunction order.] And when I denied [ClearOne's TRO] motion earlier this week, it was based on the representation by counsel for the purchaser of WideBand Solutions that assets – that the code involved in this litigation was not transferred. But it was transferred [based on the language of the asset purchase agreement]. I'm feeling that there's been a little bit of hocus-pocus . . . ."); June 26, 2008 Hr'g Tr. (Docket No. 963) at 10 (in which Mr. Frails confirmed that Lonny Bowers was the November 18, 2009principal person from WideBand Massachusetts with whom Mr. Frails worked in connection with asset purchase transaction).

12

property that the court preliminarily had found to be ClearOne's protected trade secret. (See Docket No. 897 ["TRO Motion"].) ClearOne's TRO Motion sought an order stopping the transaction reflected in the WideBand Asset Purchase Agreement, or to the greatest extent possible, stopping any further performance of that transaction by any of the WideBand Defendants.

That same day—June 19, 2008—ClearOne filed a separate lawsuit, in this court, against WideBand Georgia and Donald Bowers alleging fraudulent transfer. (See ClearOne Comm'ns, Inc. v. Wideband Solutions, Inc. (a Georgia corp.) & Donald Bowers, Case No. 2:08-CV-474-TS (D. Utah).)

The following day, on June 20, 2008, the court held a hearing on the renewed TRO Motion. (See Tr. of June 20, 2008 Hr'g on Renewed TRO Mot. (Docket No. 923).) During that hearing, the court discussed the 2007 preliminary injunction order:

> The reason . . . my preliminary injunction only went to [the Harman Code] is because nothing was imminent on other fields. But I can tell you, had I known if there had been a sale in the wings of all [of WideBand's] code, like the Biamp Code, and they brought [sic] it, the order would have been broader. But what I'm saying is [my 2007 order] explains in connection with the complaint what code is at issue in this lawsuit. That is the code that has been transferred. That is the basis of this motion for a T.R.O.

(June 20, 2008 Hr'g Tr. (Docket No. 925-2) at 11.)

The court noted that it wished to issue an injunction to maintain the status quo. "I just don't want this sale to in any way put that code another step away from whatever is going to happen in this litigation." (Id. at 16.) The court expressly stated that it did not want WideBand Massachusetts "gutted." (Id. at 22.)

Just don't do anything [including sale of the products that the court preliminarily

found contained the ClearOne trade secret] – so that let's say worst case scenario for you I find that a majority or all of WideBand Massachusetts' codes were derived from the ClearOne algorithm. [Then] I say all of it goes back. . . . But if you've transferred that code on to somebody else, there are all sorts of problems.

(Id.) ClearOne then expressed its concern about "dissipation of [WideBand's] assets." (Id. at 24.) The court further stated:

I'm going to freeze things right now as – and if I have to do it only from the side of the WideBand Massachusetts side, but I don't want the sale going on getting more wound up until I can fully hear on whether what was sold could legitimately be sold. That's the thing. I want to just stop everything in its tracks. I don't want money going back and forth, because if in fact ClearOne prevails and shows that these products are derived from code that belonged to it, then WideBand Georgia has got the money, but . . . the judgment would probably be against WideBand Massachusetts. . . . So money needs to stop. I don't want WideBand Massachusetts sending any money out. They might need to make ClearOne whole. They might not. I haven't had time and I won't for sometime to decide that. Things must stop. That's just what I'm saying. . . . [WideBand Massachusetts] can go on as it was just like before June 16th, whatever payments, whatever arrangements. I just don't want money going to WideBand Georgia that ultimately – that might be from the sale of products [containing the trade secret].

(Id. at 26 (emphasis added).)

On June 25, 2008, the court issued a written TRO concerning the WideBand Massachusetts asset disposition. The TRO applied "not only to the WideBand Defendants, but also each and every one of their agents, servants, officers, employees, entities, attorneys, and those acting under their direction or control and any other persons who are in active concert or participation with any of the WideBand Defendants." (June 25, 2008 Order (Docket No. 908).) The court further ordered that:

The WideBand Defendants will take no further action in connection with any sale or transfer of ownership of the following of the WideBand Defendants' assets to WideBand Georgia or any other person or entity: the FC101 code, the WC301 code, the WC301A code, the Biamp code, the Harman code, and the SimphoniX code, whether consisting of source or object code, as well as the algorithms

14

related thereto (collectively, the "Disputed Codes"). <u>This includes, without limitation, a prohibition upon the execution of any additional documents related to or necessary for the performance of the WideBand Sale Agreement to the extent it effects a sale or transfer of ownership of the Disputed Codes.</u> **This further includes, without limitation, any other action to convey, transfer, encumber or pledge ownership in any or all of the Disputed Codes in favor of WideBand Georgia, including, without limitation, the performance of any licensing or <u>other agreements encumbering the Disputed Codes through or in conjunction with WideBand Georgia, even if such agreements were executed <i>prior to</i> the Court's issuance of a temporary restraining order on June 26, 2008.</u>** In other words, WideBand Defendants will not allow or assist WideBand Georgia in any efforts to license or to transfer or, convey ownership or otherwise effect in any way any of the Disputed Codes. . . . None of WideBand Defendants' profits from the Disputed Code shall be transferred or conveyed to WideBand Georgia.

(<u>Id.</u> (emphases added).)

But on July 10, 2008, after ClearOne filed yet another TRO motion, the court held another hearing concerning the asset transfer  (<u>See</u> ClearOne Mot. TRO & Prelim. Inj. Re: Asset Sale (Docket No. 914) (seeking broader injunction freezing disposition of <u>all</u> WideBand Massachusetts's assets, not just the disputed codes).)  Mr. Frails again appeared by telephone on behalf of WideBand Georgia and Donald Bowers.  (<u>See</u> July 10, 2008 Hr'g Tr. (Docket No. 966) at 2-3.)  During the hearing, the court noted its inclination to grant the motion because "[i]t seems to me that through the papers ClearOne has shown that they will suffer irreparable harm if all the assets leave WideBand Massachusetts, go to WideBand Georgia, even perhaps becoming insolvent, and if there's a judgment, WideBand Massachusetts won't be able to respond. . . . [I]t looks like there are some real concerns about the transfer itself."  (<u>Id.</u> at 3.)

Mr. Frails commented that:

My client believed that he suffered harm as it related to your order dated I believe it was June 27th [sic], 2008. . . . [M]y client would like to have settled this matter by rescinding the sale. . . . In spite of [ClearOne's refusal to settle in that way], my

client decided to rescind the sale anyhow.  And so, therefore, the actual asset purchase has been rescinded because in essence my client felt that he was buying nothing.

(Id. at 3-4.)  (Donald Bowers later confirmed Mr. Frails's representation by filing a copy of the Agreement to Rescind.  (See Ex. B to Don Bowers's Answer (Docket Entry No. 12) in WideBand Georgia Case, 2:08-CV-474 (D. Utah).))

Mr. Frails then represented that the TRO motion would be moot "because we haven't transferred anything."  (July 10, 2008 Hr'g Tr. at 5.)  The court and ClearOne's counsel agreed that the rescission mooted the basis for ClearOne's motion.  (See id. at 4-5 (ClearOne's counsel said "we will rely on Mr. Frails' representations that nothing has actually been transferred, the assets haven't been transferred obviously, the code hasn't been transferred.").)  Accordingly, the court denied the motion as moot.  (See July 10, 2008 Order (Docket Entry No. 11 in WideBand Georgia Case); July 10, 2008 Order (Docket Entry No. 922 in this case).)

In October 2008, the court granted Don Bowers's motion to dismiss the WideBand Georgia Case without prejudice on the basis that the claims, all of which concerned the rescinded asset purchase agreement, were moot.  (See Oct. 20, 2008 Order (Docket Entry No. 23) in WideBand Georgia Case;  Defs.' Mot. to Dismiss Without Prej. (Docket Entry No. 21 in WideBand Georgia Case) at 2 (noting that ClearOne's claims in WideBand Georgia Case were "based [entirely] on an asset purchase transaction that was rescinded").)

**2.      Trial**

In late October/early November 2008, the court held a two-week jury trial.  On November 5, 2008, the jury issued its special verdict finding, among other things, that all of the defendants had wilfully and maliciously misappropriated ClearOne's Honeybee Code trade secret.  (See

Docket No. 1286.)  The jury awarded ClearOne more than ten million dollars in compensatory and punitive damages.

### 3. Post-trial Events

#### a. Expansion of the October 30, 2007 Preliminary Injunction

On February 4, 2009, the court expanded its October 30, 2007 Preliminary Injunction to preliminarily enjoin use of the following products containing the Honeybee Code:

(a)     the AEC2W code licensed to Biamp Systems Corporation;

(b)     the computer code licensed to Harman Music Group, Inc. that was the subject of the October 30, 2007 Preliminary Injunction Order;

(c)     WideBand's FC101 product;

(d)     WideBand's WC301 product;

(e)     WideBand's WC301A product; and

(f)     *WideBand's Simphonix, including Si-40, and Si-400*.

(Feb. 4, 2009 Order Expanding Prelim. Inj. (Docket No. 1428) (emphasis added).)  The above list of products was referred to as the "Infringing Products" because evidence at trial showed that the products contained the stolen Honeybee Code.  After the court made its findings, it ordered:

> 1.     That Defendants Andrew Chiang, Jun Yang, Lonny Bowers, WideBand Solutions, Inc. ("WideBand"), and Versatile DSP, Inc. (collectively, the "WideBand Defendants"); as well as WideBand Defendants' agents, servants, officers, employees, entities, and those acting under their direction or control, are hereby enjoined, until such time as a permanent injunction is entered which supersedes and replaces this order, from disclosing or using in any way the following: (a) the Honeybee Code (including its unique algorithms or sub-algorithms that are not in the public domain), whether in the form of source code, object code, or any other form; (b) the product development documentation for the Honeybee Code or any other documentation that reveals the contents of the Honeybee Code; and (c) the Infringing Products (listed above).

17

2.     These restrictions include, without limitations, a restriction upon any further marketing, selling, manufacturing, development, modification, duplication, or transport or delivery of technology containing the Honeybee Code. These restrictions also include, without limitation, a restriction upon any further marketing, selling, delivery, and/or use of technology or products containing the Honeybee Code to service any past or existing customers.

(Id. at 5-6.)

        b.    <u>Asset Preservation Order</u>

On February 24, 2009, the court issued an order setting forth procedures to preserve and

return to ClearOne the Honeybee source code and object code that the WideBand Defendants had

misappropriated (the "Infringing Products"):

12.     At the same time as the Computer Forensic Expert supervises and participates in the gathering of the ClearOne Protected Information, the Computer Forensic Expert shall also do the following, and <u>the WideBand Defendants shall fully cooperate in all regards to assist the Computer Forensic Expert in accomplishing the following</u>:

     a.     The Computer Forensic Expert <u>shall **_participate in and supervise_**</u> <u>the gathering of **_all source code and object code files_** comprising code for or relating to the Infringing Products</u>, as described in the Court's February 4, 2009 Order Expanding Preliminary Injunction.

     b.     The Computer Forensic Expert <u>shall participate in and supervise</u> <u>the **_duplication of all object code and source code files_** relating to the Infringing Products onto a separate hard drive.</u>  The Computer Forensic Expert shall retain and **_maintain this hard drive_** pending further order of the Court.

     c.     **_The Computer Forensic Expert_** <u>shall **_then_** participate in and supervise the _permanent_ deletion of all of these object code and source code files from WideBand Defendants' computers.</u>

     d.     The Computer Forensic Expert <u>shall create a log, identifying the information permanently deleted</u>, as described above, such as file name, file type, file size, location within the directory structure on the hard drive, and the hard drive/computer on which it was located. The Computer Forensic Expert shall retain and maintain this log pending further order of the Court.

(February 24, 2009 Order at 11-12 (emphases added) (Docket No. 1475) ("Preservation Order").)

        c.      The WideBand Defendants Intentionally "Scrubbed" Computers and Replaced the Hard Drives in the WideBand Massachusetts Server Before the Court-Ordered Imaging Could Take Place

Despite the court's Preservation Order, Dr. Yang, at his July 8, 2009 deposition, claimed that he, and the other WideBand Defendants, had permanently deleted and destroyed every copy of the WideBand Massachusetts source and object code for all of the WideBand Massachusetts products, i.e., the FC101, the WC301, the Biamp or AEC2w code, the Simphonix codes, and the Harman code. (See Yang Dep. at 81-82, 100-107, 109-112, 115-116, 151-152 (attached as Ex. G to Mem. to Enforce).) The formatting of the hard drives destroyed not only the WideBand Massachusetts codes, but also any other discoverable evidence. (Yang Dep. at 104-05.) Dr. Yang said he did not make any backup of the source code or keep any copy of the source or object code. (See Yang Dep. at 102-03, 115-16.)

He also claimed that he and the other WideBand Defendants permanently deleted and destroyed all of the WideBand Massachusetts source code and object code because this court ordered them to do so. (Id. at 81-82, 101-01.) But he is mistaken about what the court ordered. The court did not order them to permanently delete and destroy all of the evidence.[10] That is made clear in the court's February 24, 2009 Order (the "Preservation Order") quoted above.

On June 22-24, 2009, and pursuant to the court's February 24, 2009 Order, after much stalling by the WideBand Defendants, ADR Forensics ("ADR") was finally able to image the

---

[10]The Subject Parties point to a statement made by the court during the February 10, 2009 hearing, but if one reviews the transcript, the Subject Parties's interpretation is inaccurate. (See Feb. 10, 2009 Hr'g Tr. at 66-72, 83-84, 104; L. Bowers's Response to ClearOne's Expedited Mot. for Order to Enforce Perm. Inj. & for Contempt (Docket No. 1763) at 7-13.)

computers of the WideBand Defendants. (July 2009 Hr'g Exs. 45, 46.) But the imaging was not fruitful, because after the imaging done in the summer of 2007 (at the court's order), and before ADR performed the imaging, someone had physically opened the server and swapped out the two hard drives. (July 2009 Hr'g Exs. 45, 46, 48.)

The scrubbing of the computers, the claim that the source code was deleted, the swapping out of hard drives, and the obstruction and delay is further evidence of the Subject Parties's disregard for the court's orders and their efforts to obstruct ClearOne's ability to obtain assurance that copies of the Honeybee Code are not in the wrong hands.

c.      Issuance of the Permanent Injunction

As noted above, on April 8, 2009, the court issued its Permanent Injunction. (See Apr. 8, 2009 Permanent Injunction (Docket No. 1525).)

d.      Donald Bowers's Personal Civil Contempt

On September 3, 2009, the court issued an order finding Donald Bowers in civil contempt of court. The following describes the history leading up to the contempt order.

A day after the jury issued its verdict against the WideBand Defendants, and despite Donald Bowers's notice of the TRO barring any encumbrance of WideBand Massachusetts assets, he knowingly violated it when he filed a UCC financing statement in Massachusetts encumbering all of WideBand Massachusetts's assets, including intellectual property. The UCC filing prompted another order to show cause to Donald Bowers (and others) for alleged violation of the court's prohibition on transfer or encumbrance of WideBand Massachusetts's assets. (The UCC filing was circumstantial evidence that an agreement encumbering WideBand Massachusetts's intellectual property still existed or had been executed since the court's June 26,

2008 Order, the July 7, 2008 Agreement To Rescind, and the court's October 20, 2008 dismissal of the WideBand Georgia Case.)

After two hearings,[11] the court found Donald Bowers in contempt of court "for filing a UCC-1 Financing Statement in Massachusetts on November 6, 2008, thereby encumbering WideBand Solutions' intellectual property at issue in this trade secret litigation in violation of the court's June 26, 2008 Order," and "for failing to appear at the February 10, 2009 contempt hearing." (Sept. 3, 2009 Order of Contempt (Docket No. 1902) at 2.) The September 3, 2009 Contempt Order sets forth a complete history of that contempt matter. In that order, the court described the contemptuous behavior:

> The pledging of the assets and the signing of such security or other agreements granting a security interest, as well as the UCC filing, are direct violations of the court's June 26, 2008 Order. Stated another way, Donald Bowers either withheld the information from the court in 2008 when it clearly should have been disclosed during the TRO proceedings, or he concocted [i.e., forged] the April 2008 agreements in a short-sighted attempt to justify the UCC filing for which he was facing contempt charges. Either way, he has committed fraud on the court.

(Docket No. 1902 at 22 (footnote omitted).)

Upon finding Donald Bowers in contempt, the court also noted that Donald Bowers (1) attempted to avoid service of papers; (2) failed to appear at the first OSC hearing despite proper notice; (3) apparently misrepresented facts to the court about the existence of the agreement concerning transfer of WideBand Massachusetts's assets to WideBand Georgia (he allegedly rescinded the agreement, which caused the court to forego further injunctive remedies and to dismiss a related fraudulent transfer case as moot); and (4) withdrew the UCC filing

---

[11]The hearings were held on February 10, 2009, and June 3, 2009.

without informing ClearOne or the court until much later, even after an OSC had been issued. (See id. generally.)

The court ultimately issued an order of contempt and required Donald Bowers to take actions to assure the court that no encumbrances on WideBand Massachusetts's assets existed and to pay ClearOne's attorneys' fees and costs. Instead of paying the fees and costs, Donald Bowers filed a personal bankruptcy petition in Georgia on September 17, 2009, the same day that ClearOne submitted its application for fees and costs awarded by the court for Donald Bowers's contempt. The automatic stay, currently in place, bars ClearOne from collecting on the contempt judgment for fees and costs.

**D.    Current Contempt Proceedings**

**1.    The July 2009 OSC and July 31, 2009 Evidentiary Hearing**

While the contempt matter concerning Donald Bowers was pending, ClearOne filed a sixth motion for order to show cause (the July 2009 Motion for OSC). In that motion, ClearOne alleged that the WideBand Defendants continue to sell products containing the Honeybee Code (which the jury found had been wilfully and maliciously misappropriated by the WideBand Defendants) through a new company named DialHD, Inc. At the time of ClearOne's motion, the DialHD products at issue were the "AEC4" and the "Mix-4" (or "Automixer").

The court issued an order to show cause ("First OSC") to Lonny Bowers, Andrew Chiang, Jun Yang, WideBand Solutions, Inc. (a Massachusetts company) ("WideBand" or "WideBand Massachusetts"), Versatile DSP, Inc., WideBand Solutions, Inc., a Georgia Company ("WideBand Georgia"), Donald Bowers, David Sullivan, and DialHD, Inc. (the "Subject Parties"), requiring them show good cause why they should not be held in contempt for violating

certain court orders, including the Permanent Injunction.[12]  (See July 17, 2009 Order (Docket No. 1750) at 1-2.)

The First OSC also required the Subject Parties to make a full written disclosure to ClearOne before the hearing regarding their knowledge of the condition of the business of WideBand Massachusetts and DialHD, including information about DialHD products.  (Id. at 4-5.)

The court held an evidentiary hearing on July 31, 2009, to investigate the alleged contemptuous actions of marketing and selling the AEC4 and Mix-4 products by DialHD.[13]  The Court heard testimony from private investigator Andrew Moan, ClearOne employee Derek Graham, and ClearOne expert witness Thomas Makovicka, and received into evidence exhibits submitted by ClearOne (the "July 2009 Hr'g Exs.").  (See July 31, 2009 Transcript (Docket No. 1849) [hereinafter "July 2009 Tr."].)

At the end of the hearing, the court issued the TRO which was memorialized on August 5, 2009.  But the contempt matter has been under advisement until now.

---

[12]The OSC focused not only on the court's Permanent Injunction but also on the February 4, 2009 Preservation Order (Docket No. 1475) and two separate orders directing the WideBand Defendants, and those acting in concert, to ensure that WideBand Massachusetts's assets were preserved (the "No Asset Transfer Orders").  (See, e.g., June 26, 2008 Order (Docket No. 908); March 17, 2009 Order (Docket No. 1498).)

[13]ClearOne appeared through counsel of record.  Defendant Biamp Systems Corporation ("Biamp") is not the subject of the contempt hearings, but it did appear at the hearing through counsel (by way of telephone).  Despite cautionary advice from the court, none of the Subject Parties was represented by counsel.  Instead, individual defendants Andrew Chiang, Dr. Jun Yang, and Lonny Bowers appeared on their own behalf, by telephone.  Subject Parties Donald Bowers and David Sullivan also appeared on their own behalf, by telephone.

## 2. The October 2009 OSC and November 9, 2009 Evidentiary Hearing

In October, while the July contempt matter remained pending, ClearOne filed its seventh motion for an order to show cause, in which ClearOne presented further evidence that the Permanent Injunction and now the August 2009 TRO have been violated by the some of the same Subject Parties.

In that motion, ClearOne alleges that the WideBand Defendants and third parties are continuing to sell products containing the Honeybee Code through DialHD under yet another product name: the DialHD HD4551 Product (a repackaged AEC4 or Simphonix product).

The court issued its Second OSC to the same parties as those named in the First OSC, with the exception that Donald Bowers, as an individual, is excepted because the automatic stay in his recent personal bankruptcy action has not been lifted. The court's Second OSC also required disclosure of certain information to ClearOne concerning the latest allegations of contempt and fraud on the court. Then the court held an evidentiary hearing on November 9, 2009. (See Nov. 9, 2009 Hr'g Tr. (Docket No. 1999).) During the November 9, 2009 hearing, further evidence suggested that certain Subject Parties are selling a repackaged WideBand WC301 under the name Longoo ACON1001. (See id. at 37-38, 75-88.) (The court does not find the Subject Parties's attempt to blame Longoo as a rogue company persuasive.)

In sum, the court finds that DialHD was created and used as a vehicle to repackage the WideBand Simphonix Si-400 product as the DialHD AEC4 and HD4551 products, and that the Subject Parties's blame of an alleged "rogue" Chinese company, Longoo, is a red herring used in an attempt to deflect the truth: that DialHD was established to carry on the enjoined business of WideBand Massachusetts. The court further finds that DialHD is in possession and control of

WideBand Massachusetts's technology, code, algorithms, and other assets.

**E.    Specific Evidence of Contempt**

**1.    DialHD, Inc.**

DialHD, Inc. is a company registered to conduct business in the State of Georgia, and was

established on November 17, 2008 – just days after the jury returned its verdict.  (See DialHD

Cert. of Incorp. from State of Georgia, July 2009 Hr'g Ex. 37.)  Donald Bowers, the father of

WideBand Defendant Lonny Bowers, is the incorporator of DialHD:

> **The name and address of incorporator(s) are:**
> Donald Bowers
> 4141 Columbia Road, Suite C
> Augusta, GA  30907

(See id.)

Donald Bowers is also the only member of the Board of Directors, and the Chief

Executive Officer and Chief Financial Officer for DialHD:

> **The optional provisions are:**
> Board of Directors.  The initial Board of Directors shall consist of the following
> Company Members:
>
> Donald Bowers, CEO; CFO
> 4141 Columbia Road
> Suite C
> Augusta, GA  30907

(See id.)

The DialHD address is the same as that registered to WideBand Georgia, the company of

Donald Bowers.  (WideBand Georgia was the subject of the Court's June 26, 2008 TRO barring

transfer of certain intellectual property assets through any asset disposition agreement, especially

the one between WideBand Georgia and WideBand Massachusetts.  (See Docket No. 908.))

According to Donald Bowers, he started DialHD as a company to work with his son, Lonny Bowers, in the teleconferencing industry.  (See June 3, 2009 Hr'g Tr. (Docket No. 1672) at 82-83.)  He also told the court that DialHD hired David Sullivan, former Chief Information Officer of WideBand Massachusetts, to create the Dial HD website.  (Id. at 83.)  ClearOne has since presented payroll records for Mr. Sullivan dated June 2009, long after the creation of the DialHD website in November 2008, that undermine Donald Bowers's representation that Mr. Sullivan's involvement with DialHD was fleeting.  (See Payroll Records, July 2009 Hr'g Ex. 64.)

Although DialHD is incorporated in Georgia, it operates out of the same Connecticut office space previously occupied by WideBand.  (See June 3, 2009 Tr. at 72-73 (Donald Bowers admits that DialHD is also using the address of 37 Northwest Drive, Plainville, Connecticut, "because WideBand vacated that location");  July 2009 Hr'g Ex. 33 at 31 (DialHD manual, identifying same Connecticut business address as WideBand).)

DialHD maintains a public website, http://www.dialhd.com, which was created on November 12, 2008 – less than one week after the jury's verdict, with Lonny Bowers as the "Administrative Contact" and David Sullivan as the "Technical Contact" for the site.  (See Whois Record for DialHD, July 2009 Hr'g Ex. 38.)

On its website, DialHD says it sells Polycom telephones.  (See DialHD Webpages, July 2009 Hr'g Ex. 39;  see also June 3, 2009 Tr. at 72 (Donald Bowers represented to the court that DialHD was formed on November 17, 2008, because "that's when we got our distributorship for Polycom").)  The DialHD website does not reveal that the company offers products called the "AEC4" and the "Mix-4" or "Automixer."  (See DialHD Webpages, July 2009 Hr'g Ex. 39.)  It does, however, offer the vaguely named "BoardroomHD" solutions.  For that product or service,

the company does not list any vendor, product, or brand, but rather provides a button asking the

potential customer to "E-mail us About BoardroomHD." (See id.)

2. **The Subject Parties Violated the First OSC's Disclosure Requirements through False or Non-Responsive Answers about DialHD and WideBand.**

In response to the First OSC's disclosure requirements, some, but not all, of the Subject

Parties provided information. (See July 2009 Hr'g Exs. 53, 54, 56, 57.) But that information

was false or non-responsive, without any valid excuse for withholding documentation that clearly

exists.

Perhaps most egregious is Lonny Bowers's response. Mr. Bowers gave false answers to

the court and withheld information he was obligated to disclose. Paragraphs 7c through 7g of the

court's order required disclosure of information about the business and products of DialHD; the

owners and investors in DialHD; the office locations of DialHD; the persons working for

DialHD; and the persons or entities selling or marketing DialHD products. In response to each

such inquiry, Lonny Bowers claimed that he did "not have sufficient personal knowledge to

answer this question." (July 2009 Hr'g Ex. 53.)

His response was false. For example, before the court issued the First OSC, Lonny

Bowers sent out e-mail communications using the e-mail address of Lonny@dialhd.com, and

which included other references and contact information for Lonny Bowers at DialHD. (July

2009 Hr'g Exs. 11, 60, 63.) And on July 17, 2009, in one of those e-mails, Lonny Bowers

attached a DialHD Power Point presentation that promoted the very same "BoardroomHD"

solution that Lonny Bowers claimed that he had "no knowledge" about in his July 24, 2009

Disclosure. (July 2009 Ex. 11-12.)

Moreover, ClearOne's private investigator Andrew Moan spoke directly with Lonny Bowers, who claimed to be the "Technology Evangelist" for DialHD, and spoke to Mr. Moan about DialHD products. (July 2009 Tr. at 24.) Specifically, the evidence shows that in July 2009, Mr. Moan spoke to Douglas Pervis of Spectrum Audiovisual Systems in Virginia about installing an audio conferencing system. (July 2009 Tr. at 21.) The Spectrum Audio Visual Systems website contained a DialHD logo. (Id.; July 2009 Ex. 58.) Mr. Pervis recommended that Mr. Moan speak to Lonny Bowers about the system because Mr. Bowers "could explain to [Mr. Moan] the ins and outs" of the system. (July 2009 Tr. at 22.)

Mr. Moan received a telephone number from Mr. Pervis. When Mr. Moan called the number on July 29, 2009, a man answered the phone with the statement, "Dial H.D." (Id.) When Mr. Moan asked to speak to Lonny Bowers, he was transferred to an individual who identified himself as Lonny Bowers. (Id.) The following description of the conversation comes from Mr. Moan's testimony during the July 31, 2009 hearing:

Q    (BY MR. MAGLEBY) AFTER [LONNY] BOWERS IDENTIFIED HIMSELF, TELL US WHAT WAS -- WHAT YOU SAID TO HIM.

A    I INFORMED MR. BOWERS THAT DOUGLAS PERVIS OF SPECTRUM HAD GIVEN ME HIS TELEPHONE NUMBER IN REGARDS TO LEARNING SOME MORE INFORMATION ABOUT THE DIAL H.D. PRODUCT. AND HE ACKNOWLEDGED HIS ACQUAINTANCE OF MR. PERVIS. HE STATED THAT HE HAD COMPLETED MANY JOBS OVER THE LAST FEW YEARS WITH -- WITH MR. PERVIS.

Q    OKAY. DID HE SAY SOMETHING ABOUT IT BEING A BIG

BUSINESS BUT A SMALL NEIGHBORHOOD?

A     HE DID. HE SAID, "IT'S A BIG BUSINESS BUT A SMALL

NEIGHBORHOOD, AND WE ALL TRY TO WORK TOGETHER."

Q     DID YOU INQUIRE OF MR. BOWERS ABOUT THE COMPONENT

THAT DIAL H.D. WOULD BE PROVIDING FOR YOUR AUDIO VISUAL

PRODUCT – PROJECT?

A     I DID. I ASKED HIM, YOU KNOW, HOW LARGE THE UNIT

WOULD BE THAT I WOULD NEED. AND HE SAID -- HE DESCRIBED IT

AS BEING 19 INCHES WIDE, FIVE INCHES DEEP, ONE-AND-A-HALF

INCHES TALL. AND HE COMPARED IT TO A STEREO SYSTEM

COMPONENT.

. . . .

Q     DID HE SAY WHETHER OR NOT THE SYSTEM MIXED SIGNALS

FROM MICROPHONES?

A     HE DID. HE STATED IT WOULD MIX THE SIGNALS.

. . . .

Q (BY MR. MAGLEBY) OKAY. DID YOU ASK MR. BOWERS WHAT HE

DID FOR DIAL H.D.?

A     I DID. AT ONE POINT I ASKED HIM IF HE WAS A SALESMAN FOR

DIAL H.D., AND HE RESPONDED NO, THAT HE WAS THE

TECHNOLOGY EVANGELIST. . . .  HE THEN SAID THAT IN THE

TECHNOLOGY FIELD THEY TRY TO GET AWAY FROM TRADITIONAL

TITLES.

Q (BY MR. MAGLEBY) DID MR. BOWERS, MR. LONNY BOWERS, TALK ABOUT ANY OTHER DIAL H.D. JOBS OR CUSTOMERS?

A     YES, HE DID. HE SPECIFICALLY MENTIONED GOOGLE AND G.M. HE SAID WHEN GOOGLE NEEDS A THOUSAND ROOMS TO ROLL OUT OR WHEN G.M. NEEDS ANSWERS, THEY CALL HIM.

Q     OKAY. DID HE SAY ANYTHING ABOUT A.O.L.?

A     YES. IT WAS MENTIONED IN THE CONVERSATION WITH MR. PERVIS. HE SAID MR. PERVIS FROM SPECTRUM STATED THAT HE WAS WORKING IN JOINT PARTNERSHIP WITH DIAL H.D. TO GET A CONTRACT WITH A.O.L. TO PROVIDE AUDIO SYSTEMS. SO I ASKED MR. BOWERS IF HE INDEED WAS TRYING TO GET A CONTRACT WITH A.O.L., TO WHICH HE REPLIED, "YES, WE ARE."

Q     NOW, MR. MOAN, WOULD YOU BE SURPRISED TO HEAR THAT MR. BOWERS HAS CLAIMED TO THIS COURT THAT HE DOES NOT KNOW WHAT DIAL H.D. SELLS?

A     I WOULD BE.

Q     HOW COME?

A     HE WAS THE PERSON I SPOKE TO REGARDING THE EQUIPMENT.

Q     AT ANYTIME IN YOUR CONVERSATION WITH MR. LONNY BOWERS DID HE EVER SAY TO YOU, "I HAVE NO IDEA WHAT

PRODUCTS DIAL H.D. SELLS"?

A      NO, HE DID NOT.

Q      DID HE EVER SAY, "I DON'T KNOW ANYTHING ABOUT DIAL

H.D.'S EMPLOYEES OR CUSTOMERS. WHY ARE YOU BOTHERING ME"?

A      NO, HE DID NOT.

Q      DID HE EVER SAY ANYTHING TO YOU ABOUT ANY COURT

ORDERS THAT APPLIED TO HIM OR WOULD RESTRICT HIS ABILITY

TO SELL YOU THE PRODUCT?

A      NO, HE DID NOT.

. . . .

Q      OKAY. AND DID YOU GET THE IMPRESSION THAT HE WAS

TRYING TO PROMOTE OR SELL THE DIAL H.D. PRODUCT?

A      I WOULD SAY PROMOTE IS A GOOD WORD. I DON'T BELIEVE

HE WAS TRYING TO SELL ME THE PRODUCT BECAUSE HE KNEW

THAT I WAS ALREADY WORKING WITH MR. PERVIS OF SPECTRUM

AUDIO VISUAL.

Q      OKAY. DID YOU HAVE ANY DOUBT THAT IF YOU WANTED TO,

YOU COULD GET THE DIAL H.D. AEC4 PRODUCT THROUGH MR.

PERVIS AND SPECTRUM AND GET ASSISTANCE FROM MR. BOWERS

IN GETTING THAT PRODUCT INSTALLED?

A      I HAVE NO DOUBT.

(July 2009 Tr. at 22-26.)  Contrary to his claimed ignorance, Lonny Bowers had a wealth of

information about DialHD.

DialHD, through Donald Bowers, also violated the First OSC's disclosure requirements.[14] At a minimum, Donald Bowers was aware of the DialHD offices in Connecticut. As the CEO and CFO of DialHD, Donald Bowers cannot credibly claim no knowledge about the AEC4 and Mix-4/Automixer products, particularly after he represented to the court that those DialHD products were purchased as "turnkey" products from a company in China. (July 2009 Tr. at 165.) The court views his refusal to provide <u>any</u> information or documents under the guise that the information was "confidential business information and should not be provided to our competitor," (<u>see</u> July 2009 Hr'g Ex. 56), as obstruction.

David Sullivan also violated the First OSC's disclosure requirements by providing false and non-responsive answers. He did not provide any information, claiming in response to each and every question that "David Sullivan lacks sufficient personal knowledge to answer this question." (July 2009 Hr'g Ex. 57.) His claim that he has no personal knowledge of DialHD is false; he is employed by DialHD, as confirmed by the DialHD website registration documents and the DialHD payroll records presented by ClearOne. (July 2009 Hr'g Exs. 38, 39, 64.) And evidence undermines his claim that he does not have any knowledge about DialHD products: he created the DialHD website (where such products were promoted) and was listed as the technical contact for DialHD. Instead of relying on his objection to jurisdiction, Mr. Sullivan chose to provide false answers to the questions and disregard the court's order to produce documents

---

[14]The court makes these findings about Don Bowers as a principal of DialHD. The court also notes that Don Bowers made these statements at a hearing which he attended, on allegations to which he had an opportunity to respond, all before he filed for personal bankruptcy.

concerning DialHD.

Jun Yang violated the Disclosure Order by failing to respond to it, as did Versatile and WideBand Georgia.

### 3.   ClearOne Purchases Infringing Products

In its attempt to protect its intellectual property, ClearOne retained a private investigator, the Airde Group, Inc. ("Airde"), to research possible violations of the Permanent Injunction. Through Airde, ClearOne learned that DialHD is selling the WideBand Simphonix Product through DialHD under new product names.

#### a.   Acquisition of WideBand Simphonix Si-400 and DialHD AEC4

Airde found that it could purchase a WideBand Simphonix Si-400 from a company called Lucid Corporation ("Lucid") of Bristol, Connecticut.  According to Lucid's website, it maintains a partnership with WideBand.  (Lucid Website, available at http://lucidcorp.net/Vendors.html, July 2009 Hr'g Ex. 40.)

On June 16, 2009, licensed Airde private investigator Andrew Moan (whose testimony about his conversation with Lonny Bowers was quoted supra) placed a telephone call to Lucid and spoke with Lucid's President, Robert Berube.[15]  (July 2009 Tr. at 15.) Mr. Berube told Mr. Moan that Lucid had the WideBand Simphonix Si-400 for sale and "that WideBand had gone through some corporate changes and had revised their company line and changed their name to

---

[15]Mr. Berube was not a witness at the evidentiary hearing because he was not available. However, his statements (presented through ClearOne's witness Andrew Moan) are not hearsay because they are not being offered for the truth of the matter asserted.  Rather, the statements were presented to establish background for a conversation that Mr. Moan had with Lonny Bowers and to establish how ClearOne acquired the DialHD AEC4 product.

Dial H.D. and had also updated some technology." (Id. at 16.) When Mr. Moan asked Mr. Berube who the contact would be for DialHD or WideBand, he said the name "Lonny." (Id.)

On June 22, 2009, Mr. Moan again spoke with Mr. Berube on the telephone to obtain a price quotation for the purchase and installation of the WideBand Simphonix Si-400. (Id. at 17.) Mr. Berube advised Mr. Moan that it would be better "to purchase the Dial H.D. AEC-4 unit. Since [Mr. Moan was supposedly] starting a new system, it would make sense to start with the new product with the new company name." (Id.)

On June 30, 2009, Mr. Moan paid for and received a new DialHD AEC4 plus unit in its box from Lucid. (July 2009 Hr'g Exs. 9, 10, 100.) Mr. Moan then shipped the DialHD AEC4 unit to ClearOne's counsel, after photographing the box and its contents. (July 2009 Hr'g Exs. 75, 100.)

For comparison of products, ClearOne also recently purchased a WideBand Simphonix Si-400 product through eBay. The Simphonix unit arrived in its original packaging box, which appeared to have been unopened, and contained the main unit, a disc labeled "SimphoniX GUI and Manual Installation," and a WideBand power supply. (July 2009 Hr'g Ex. 101.)

      b.    Acquisition of DialHD HD4551

Later, as ClearOne continued to investigate violations of the Permanent Injunction and the more recent August 2009 TRO, it purchased more infringing products bearing yet a different product name.

During the second week of September 2009, ClearOne's Tracy Bathurst was traveling in China and Asia for business and acquired a DialHD HD4551 Product. Mr. Bathurst personally inspected and took photographs of the product purchased by ClearOne, in his hotel room in

China, immediately upon its receipt by ClearOne.[16]  (See Bathurst Decl. ¶ 7.)

ClearOne made arrangements to have the DialHD HD4551 shipped from China to ClearOne's headquarters in Salt Lake City.  The DialHD HD4551 product arrived on Friday, October 16, 2009 in a shipping box with the DialHD logo on it.  (See Bathurst Decl. ¶ 8;  Product Photographs by Tracy Bathurst, attached as Ex. 1 to Bathurst Decl.)  Mr. Bathurst inspected the contents of the box delivered to ClearOne and confirmed that it contained the HD4551 unit and other materials that were obtained by ClearOne in China, and which he examined in China in September 2009. (Bathurst Decl. ¶ 16.)  The box contained the HD4551 unit, a CD, a user's manual, and a power supply bearing the DialHD logo.  (See Bathurst Decl. ¶ 9; Product Photographs by Tracy Bathurst, attached as Ex. 1 thereto;  Second Declaration of Derek Graham ("2nd Graham Decl.") ¶ 7 (Docket No. 1959-8).)

### 4.    Comparison of WideBand Simphonix Products to DialHD Products

The WideBand Simphonix products contain the Honeybee Code and so the acts of marketing and selling those products are banned by the court's Permanent Injunction.  Evidence shows that the DialHD AEC4 and HD4551 products are repackaged WideBand Simphonix

---

[16]The evidence shows that DialHD has been marketing its products in China, using the same branding and promotional images found on its US marketing materials. (See Bathurst Decl. ¶ 17;  Ex. 12 at July 31, 2009 Hr'g.)  For example, a recent advertisement in a major Audio Visual publication in China, titled "InfoAV China," advertises the DialHD HD4551 unit, using the boardroom table, and the tin can images found on the DialHD website.  (See Bathurst Decl. ¶ 18; InfoAV China Article & Advertisement at 88, attached as Ex. 2 thereto.)  A "Spec Sheet" for the DialHD HD4551 (obtained from an AV trade show in China) uses the same branding and promotional images found on DialHD's US marketing materials.  (See Bathurst Decl. ¶ 19; HD4551 Spec Sheet, attached as Ex. 3 thereto.)  And both documents contain the same logo, product, and boardroom image contained in the PowerPoint presentation prepared by Lonny Bowers for DialHD.  (See Bathurst Decl. ¶ 20 and Exs. 2 & 3 thereto; July 2009 Hr'g Ex. 12 at 7.)

products and so the acts of marketing and selling them are also banned by the Permanent Injunction.

        a.      <u>The WideBand Simphonix and the DialHD Products Are Physically Identical</u>.

The WideBand Simphonix and DialHD products are in all material respects physically identical, with the only perceptible difference being the different product names on the boxes: i.e., the "WideBand Solutions" logo has been replaced by a "DialHD" logo, and the Simphonix name has been replaced by the AEC4 or HD4551 name.

The record contains photographs showing the essentially identical front and back sections of the Simphonix and AEC4 units. (<u>See</u> July 2009 Hr'g Ex. 16.) The interiors of the WideBand Simphonix product and the DialHD AEC4 products appear to be identical. (<u>See</u> <u>id.</u>)

The HD4551 unit appears identical to the AEC4 unit, with the exception that the front panel was changed to make the product look slightly different than before. Specifically, the spacing of the buttons on the front panel has been changed, plastic buttons have been replaced with metal buttons, and the AEC4 logo has now been replaced with "HD4551," but the order, labels, and functionality of the buttons remain the same. (<u>See</u> Bathurst Decl. ¶ 10; Product Photographs by Tracy Bathurst, attached as Ex. 1 thereto.) In particular,

        a.      The text printed on the front panel of the HD4551 reads, from left to right, as follows: DialHD logo, RS232, 2W Hook, 2W Mute, Auto Answer, Vol +, Vol -, HD4551, power.

        b.      The text printed on the front panel of the Wideband Solutions Si-400 and DialHD AEC4 follows a similar format. The text on the front of the AEC4 reads, again

from left to right: DialHD logo, RS232, 2W Hook, 2W Mute, Auto Answer, Vol +, Vol -, AEC4, power.

c.     The Wideband Solutions Simphonix Si-400 text reads: Wideband logo, RS232, 2W Hook, 2W Mute, Auto Answer, Vol +, Vol -, Simphonix Si-400, power.

(2nd Graham Decl. ¶ 9.)

As shown in Figures 3 and 4 of Mr. Graham's Second Declaration, the back of the HD4551 is essentially identical to the back of the Si-400 and the AEC4 units:  it has the same connector locations, terminal colors, and text labels.  (2nd Graham Decl. ¶ 10.)

An inspection of the interior printed circuit boards shows that the DialHD HD4551 uses a main printed circuit board identical to that used by the WideBand Simphonix and DialHD AEC4 products.  (Compare Fig. 5 of 2nd Graham Decl. (photograph of the interior of the HD4551 showing the revision of the main printed circuit board) with Fig. 6 (photograph of a similar region within the DialHD AEC4 showing the same revision of the main printed circuit board); see also 2nd Graham Decl. ¶ 11.)  The printed circuit board ("PCB") for a product like the WideBand Simphonix is custom designed for the product.  A custom PCB for this type of product has hundreds, or thousands, of components, parts, choices and characteristics.  Even if designed for exactly the same product, no two designers would create an identical custom PCB – there would be many differences which would be visually distinguishable by simply looking at the two PCBs.  In this case, however, the main PCBs for the WideBand Simphonix, the DialHD AEC4, and the DialHD HD4551 products appear to be identical.  (See 2nd Graham Decl. ¶ 44.)

Other physical similarities and product cross-overs include the following:

•     The DialHD AEC4 uses a WideBand transformer.  As noted, the DialHD unit

came in a DialHD original packaging box, labeled "DialHD" and "AEC4." (See July 2009 Hr'g Ex. 13 (image of one corner of the box).) However, upon opening the DialHD shipping box and examining the contents, ClearOne discovered a "WideBand Solutions" transformer labeled "HSET-15." (See July 2009 Hr'g Ex. 14.)

- The AEC4 and HD4551 utility software actually refers to and uses the term "Simphonix." (See July 2009 Hr'g Ex. 30; 2nd Graham Decl. ¶ 39 (showing that a document installed with the DialHD software for both the AEC4 and HD4551 products actually contains the name "Simphonix" on the second page, on the line that starts with reference to the Command "SSs1," and gives as a Description the phrase "Store in Simphonix").)

- The DialHD HD4551 unit delivered to ClearOne uses WideBand's power supply. (See 2nd Graham Decl. ¶ 36 Fig. 13 (photograph of the power supply included in the HD4551 packaging box ).) Under the affixed DialHD sticker is printed text. Carefully peeling back the top part of the sticker reveals the name *Wideband Solutions* labeled underneath.

(See 2nd Graham Decl. ¶ 37, Fig. 14.)[17]

---

[17]ClearOne points to other features shared by the WideBand Simphonix, the DialHD AEC4, and the DialHD HD4551 units: (a) the control buttons on the front panel perform the same functions, and are placed in the same relative order; (b) the reference designators on the printed circuit boards appear to be identical; (c) the board name, date, and revision, components, layout, ribbon cables and connectors and mechanical and electrical parts and components, on the main boards appear essentially identical; (d) with the exception of the control buttons on the front panel of the DialHD HD4551, all of the control buttons, connectors and mechanical components on the front and back panels appear to be identical in form, fit, and functionality; (e)

Minor physical differences between the WideBand Si-400/DialHD AEC4 and the DialHD HD4551 are material only because they highlight attempts to hide the origin of the product. For example, the DialHD HD4551's new button configuration is a design flaw created by an attempt to use the Si-400/AEC4 design but with different button spacing. A set of mounting holes designed to allow the RS-232 board to be screwed to posts in the bottom shell of the HD4551 metal chassis do not line up with the holes in the screw posts, and so the screws cannot go through the holes. (See 2nd Graham Decl. ¶ 13.) In addition, the ribbon cable connecting the HD4551 RS-232 board to the main board now has excessive tension (i.e., it is stretched too far) as compared to the same ribbon cable in the AEC4. (See 2nd Graham Decl. ¶ 14 & Figs. 5-6.)

b.     Performance Similarities Identified Through Comparative Testing

During the July 31, 2009 hearing and the November 9, 2009 hearing, ClearOne presented the testimony of ClearOne engineer Derek Graham, who thoroughly discussed the comparative testing he conducted on the WideBand and DialHD units. Mr. Graham was a very qualified, knowledgeable, and credible witness. Mr. Graham is ClearOne's Vice President of Research and Development, holds a bachelor's and master's degree in electrical engineering from Georgia Tech,[18] and has spent most of his career working in the field of audio and video signal processing

_____

the printed logo on the DialHD products is in the same location as the logo on the WideBand Simphonix product; (f) the "no-lead" stickers appear to be identical; (g) the units appear to have the identical internal "connectorization" (i.e., the same ribbon cables and internal connection points) as the others; (h) the units all have the same "JTAG" connectors, each with fourteen separate "pins," and on all of the units, the same pin (pin 6) has been cut manually. (See 2nd Graham Decl. ¶ 45.)

[18]Although he did not obtain a Ph.D. at Georgia Tech, he began the program after passing the preliminary and qualifying exam for the Ph.D. program, completed all the course work and began the research program. At that point, he left to work for Intel Corporation. (July 31, 2009 Hr'g Tr. at 29-30.)

and product development.  (July 31, 2009 Hr'g Tr. at 28-30.)

He is familiar with the Honeybee Code and with the testimony of ClearOne's expert witness at trial, Thomas Makovicka, who initially directed comparative testing in preparation for the trial in this case.  (See, e.g., id. at 30 (Graham testifying that he heard Mr. Makovicka testify at trial about the unique design flaw and testing results Mr. Makovicka located in the Honeybee Code).)

The court is referring to similar testing that ClearOne had done before trial on other products that it suspected were using the Honeybee Code.  Specifically, before trial, ClearOne's expert witness Thomas Makovicka asked ClearOne to conduct tests to determine whether a unique design flaw that was present in the Honeybee Code (something called the "time-domain ripple artifact") was also present in the WideBand-Biamp code.  ClearOne also conducted testing to develop an understanding of the graph that would be created by such testing (i.e., what the frequency spikes and corresponding time domain ripple artifact present in the Honeybee looked like).  These frequency spikes and the design flaw were discussed at trial.  Such graphic representations constituted evidence at trial that the code in the WideBand products used or were derived from the Honeybee Code and/or its algorithms.

Mr. Graham performed some of those tests for Mr. Makovicka before trial.  That is how he became familiar with unique design flaws (the "time domain ripple artifact" and unique "frequency spikes") in the Honeybee Code.  (Id. at 31.)  At the July 31, 2009 hearing, Mr. Graham testified that the design flaw is necessarily unique and he did not believe that any engineer would intentionally design such a problem in his code or algorithms.  Moreover, he would not "expect two engineers independently designing code to come up with or accidentally

40

come up with the same design flaw independently." (Id. at 31-32.)

Mr. Graham electronically tested the performance of the Simphonix, AEC4, and HD4551 products, using standard testing equipment and testing that ClearOne performs on its own products, as well as the products of its competitors. (July 31, 2009 Hr'g Tr. at 38; 2nd Graham Decl. ¶ 17.) The two types of testing are called "frequency sweep testing" and "single tone testing." (July 31, 2009 Hr'g Tr. at 39.) When he conducted the same type of testing on the Simphonix Si-400, the AEC4 and the HD4551 products, the design flaw showed up, so he concluded that those products contained the Honeybee Code. The unique design flaw is similar to a fingerprint. (Id. at 39, 44; Nov. 9, 2009 Hr'g Tr. at 72-74.) According to Mr. Graham, "If two sets of algorithms were developed completely independently, you would see different results as the outputs of those tests." (July 31, 2009 Hr'g Tr. at 40.) By "outputs" he meant graph-like figures presented on a computer screen. (Id. at 40-41.)

(i)    The Frequency Sweep Testing

Specifically, ClearOne conducted "frequency sweep testing" on the WideBand Simphonix, DialHD AEC4, and DialHD HD4551 products. The test results (i.e., "output signals" plotted on a graph) showed that the frequency response output signal from the WideBand Simphonix and the DialHD AEC4 units were essentially identical, which means that both products use the identical or virtually identical code and/or algorithms to process the signal that passes between the microphone input and the line output. (See July 2009 Hr'g Ex. 22 (Frequency Response of DialHD AEC4 (red) and Simphonix Si-400 (blue)) (showing frequency response so identical that it is difficult to determine the difference between the red and blue lines which almost completely overlap); July 2009 Hr'g Tr. at 40-42.) Mr. Graham testified that "[i]f

41

two products were running independently developed algorithms, I would not expect the frequency responses to align so exactly." (July 2009 Hr'g Tr. at 42.)

Then ClearOne demonstrated the differences that would be reflected by a truly different, or independently developed, set of code and/or algorithms, by presenting a graph prepared using exactly the same method and tone sweep, but for a different product, the ClearOne Converge Pro. The Converge Pro frequency response shows a markedly different frequency response when compared to the response from the WideBand Simphonix and the DialHD AEC4. (See July 2009 Hr'g Ex. 23 (frequency response test showing marked difference in response of Converge Pro from Simphonix and DialHD units);  July 2009 Hr'g Tr. at 43.)

In addition, both Derek Graham and Thomas Makovicka testified that the sudden, downward-dip in the signal shown in results from testing the AEC4 and the Simphonix was unexpected and unique, as this line would ordinarily be expected to continue in the same manner as the rest of the signal.  Both experts confirmed that this sudden, unexpected downward dip in the signal was, in the context of ClearOne's trial presentation, another "fingerprint" that demonstrated the unique nature of the code used in both products, and that the processing between the two products was the same.  Both experts also testified that this same characteristic would not be expected to manifest in exactly the same way in two independently developed sets of code and/or algorithms.  (See July 31, 2009 Hr'g Tr. at 44-45.)

A frequency sweep test was conducted on the HD4551 and compared against previous frequency tests of the Simphonix and AEC4 products.  Figure 7 of Mr. Graham's Second Declaration shows the results of this test (the HD4551 plot is shown in green, the AEC4 plot is shown in red, and the Simphonix plot is in blue).  (See 2nd Graham Decl. ¶ 19.)

The locations of the ripples in the frequency responses line up exactly between the HD4551 and the other two products. This indicates that an identical algorithm is being used for this processing in the HD4551 as in the other two products. (See 2nd Graham Decl. ¶ 20.)

<em>(ii)</em>    <em>The Single Tone Testing</em>

In addition to the frequency sweep tests, ClearOne conducted "single tone testing" (where it sends a 400 Hz tone through the product to observe the response of the system to a single pure tone) on the Simphonix product. (See July 2009 Ex. 24 (showing "frequency spikes" in graph).) Different systems have different spikes at different locations and different amplitudes.

ClearOne performed the same test on the DialHD AEC4 system. The response was virtually identical to the Simphonix system, meaning that essentially identical processing is being performed in the two systems. (See July 2009 Ex. 25; July 31, 2009 Hr'g Tr. at 46-47.) Moreover, the frequency spikes shown in the testing of the DialHD AEC4 system match the Honeybee Code's unique time domain ripple artifact described by Thomas Makovicka at trial.

Again, as ClearOne had done with the frequency sweep, it demonstrated how a truly independently designed system would respond differently to the same testing, again by using the ClearOne Converge Pro product. (See July 2009 Hr'g Ex. 25A.)

The response of the DialHD HD4551 to single tone testing was also virtually identical to the WideBand Simphonix and the DialHD AEC4, and this again indicates that essentially identical processing is being performed in the two systems. And, again, the frequency spikes depicted the existence of the Honeybee Code's *unique* time domain ripple artifact described by ClearOne's expert trial witness Tom Makovicka. That is, <u>the DialHD HD4551 continues to manifest the same type of design flaw that was found to be unique to the Honeybee Code and the</u>

derivative WideBand Simphonix code.  (See 2nd Graham Decl. ¶¶ 26-29, 32.)

      c.      The Simphonix and DialHD Products Have the Same Unique FCC Identification Number.

Mr. Graham also testified, based on his experience,[19] about the Federal Communications Commission (FCC) identification numbers (FCC ID) printed on the WideBand and DialHD products.  He testified that the FCC requires every product that connects to the public switch telephone network to have a number and comply with "Part 68"[20] "in order to prevent harm to the public switch telephone network."  (July 31, 2009 Hr'g Tr. at 52.)

The number is significant not only because it is a legal requirement but because the FCC ID number is generally not transferrable between products.  (Id. at 53.)  "An F.C.C. number does have to be unique to a particular product."  (Id. at 54.)  If a product changes (for example, it is released as a new and improved model), the company has to retest for compliance and recertify (i.e., obtain a new FCC ID) "because changes to the software in a product might affect the interface to the public switch telephone network."  (Id. at 55.)  This is expensive and time-consuming.

But, according to Mr. Graham,

> there is a condition where the F.C.C. I.D. number can be transferred, and the condition is that the product has to be exactly the same in terms of the way it interfaces to the telephone network, and complete control has to be transferred to a new company.  If that – if those two conditions are true, then the same F.C.C. I.D. number can be used for Part 68 compliance.

---

[19]See July 31, 2009 Hr'g Tr. at 64.

[20]The requirements for equipment compliance are contained in the United States Code of Federal Regulations, Title 47, Part 68.  In the telecommunications industry this requirement is usually just called "Part 68 compliance."

(Id. at 56.)  The product must be identical "from the standpoint of the telephone interface,"and

> [t]he algorithm of the product does have a connection with the interface . . . .  It has to be the same type of device.  It has to be essentially the same product.  . . . If code in the device that is related to the function of the device as far as making a telephone call, if that changes and it's a new product, you will need a new F.C.C. I.D.

(Id. at 56-58.)  Even then, the rules state that only "in the event a party transfers complete control (i.e., ownership) of its operations to another entity (the 'successor'), the original party may transfer its RPC to the successor provided the original party discontinues use and reference of its assigned RPC."  (ACTA Guidelines & Procedures for submission of information to the ACTA for inclusion in the database of approved Telephone Terminal Equipment, Revision 3.2, Dec. 2008, page 11, section 3.3.)

The images in Exhibit 27 from the July 31, 2009 hearing compare the FCC ID on the Simphonix Si-400 unit and the AEC4 units.  The units use not only the same FCC ID, but also the exact same content, font, and style. (See July 2009 Hr'g Ex. 27 (showing "FCC ID: US: WSITE00BSI-400").)

The first three digits of the FCC ID represent the "Responsible Party Code" (RPC).  In this case, the RPC printed on both products is "WSI."  (See July 2009 Hr'g Ex. 27.)  This is significant because WSI stands for WideBand Solutions, Inc. and the product for which the FCC ID applies is the Simphonix Si-400.[21]  Yet the exact same number appears on DialHD's AEC4.

---

[21]The FCC has delegated the administration and maintenance of FCC ID registration to an organization named the "Administrative Council for Terminal Attachments" (ACTA), which maintains the online web database of equipment that has successfully undergone regulatory compliance testing and has been approved as required, for use on the PSTN.  (July 2009 Hr'g Ex. 29.)  The ACTA website allows an interested person to perform a search using the RPC (among other things) to gather information about equipment labeled with a particular FCC ID number. ClearOne investigated this issue by going to http://www.part68.org.  ClearOne's search showed

So either WideBand transferred the exact same product (the Si-400) to DialHD and complied with Part 68, or DialHD is not in compliance with Part 68.[22]  The court is convinced that the former is true.  And such a transfer is a direct violation of the Permanent Injunction.

        d.      <u>The User Manuals Are For All Practical Purposes Identical.</u>

Both the WideBand Simphonix and DialHD AEC4 products came with a disc containing documents and software for the products.  Both contained user manuals which are nearly identical: they use the same layout, diagrams, and information.  (<u>Compare</u> July 2009 Hr'g Ex. 32 <u>with</u> July 2009 Hr'g Ex. 33; <u>see also, e.g.</u>, Fig. 2.2 in July 2009 Hr'g Exs. 31, 32, 33; Bathurst Decl. ¶¶ 12-14; Product Photographs by T. Bathurst, attached as Ex. 1 thereto.)

And the DialHD HD4551 product uses essentially the same product manual as the DialHD AEC4 product.  (<u>See</u> 2nd Graham Decl. ¶ 40 Fig. 15, ¶ 42 Fig. 16 (the only difference between the images in Figure 15 and Figure 16 appears to be the model name (HD4551 vs. AEC4).)

The text in the DialHD HD4551 manual appears almost identical to the manual on the AEC4 installation disk.  One notable exception is that page 31, which is included in the AEC4 manual and which contains the 37 Northwest Drive, Plainville, Connecticut address, *is missing* from the HD4551 manual.  However, the HD4551 manual continues to include the WideBand

---

that the FCC ID WSITE00BSI-400 refers to "Wideband Solutions, Inc." as the responsible party for the Si-400 product.  Other identifying information further links the FCC ID to WideBand, including an address that is the same as used by WideBand and now DialHD.  (<u>See</u> July 2009 Hr'g Ex. 28.)

    [22]According to Mr. Graham, based on his understanding of how F.C.C. I.D. registration works, he agreed that "one of two things has had to have happened, either the product is functionally identical with regard to the connection to the public switch telephone network, or somebody has violated the F.C.C. rules and regulations[.]"  (July 31, 2009 Hr'g Tr. at 63-64.)

telephone number for support, with the Connecticut area code, as is shown on page 29 of both manuals (860-410-9750). In addition, all references to product names in the DialHD HD4551 printed manual, except the model number in the image on the first page, continue to refer to the DialHD AEC4 and/or Mix 4 products, even though the manual is supposedly not for those products. (See 2nd Graham Decl. ¶ 43.)

**5. The DialHD Products Are Not "Turnkey" Products From a Company in China.**

Donald Bowers claimed at the July 31, 2009 hearing that DialHD purchased the AEC4 product as a "turnkey" products from a company in China. (July 2009 Tr. at 147.) But evidence is to the contrary. Instead, the DialHD AEC4 product depends upon, indeed uses, WideBand technology, which in turn uses the Honeybee Code. The same is true of the HD4551. Moreover, evidence shows that the Chinese company from which DialHD claims to license its audio DSP software is a sham.

At the July 31, 2009 hearing, Donald Bowers claimed that the algorithm in DialHD's products could not be the same algorithm that was used in the WideBand Simphonix product because it was supposedly independently developed by a Chinese company, Nanjing Haiyi Software, LLC ("Haiyi"), which supposedly provided DialHD with a "turnkey" solution. (See July 2009 Tr. at 147-50.) Donald Bowers further stated that the address for Haiyi was Shunke Shangwu, Suite 301, 4-5 Hunan Road, Nanjing, Jiangsu, China 210009. (See id. at 150.)

At the end of the July 31, 2009 hearing, the Court ordered the Subject Parties, and Donald Bowers in particular, to make a full disclosure related to the Chinese company. (See July 2009 Tr. at 172-73.) In Donald Bowers's August 19, 2009 disclosure, he again asserts that Haiyi was

47

the source of DialHD's products.  (See Reply to ClearOne's Findings of Fact & Conclusions of Law from July 31, 2009 Hr'g (Docket No. 1886) at 32  ("DialHD products are made in China by Nanjing Haiyi Software.  Haiyi Software purchases hardware from Hamp Scientific, which happens to be the same source that provided hardware to WideBand.  Haiyi Software is a software developer and provides their own proprietary code.").)

Donald Bowers also claims that he has been working with Guoliang Qu ("Qu") from Haiyi for the past year to develop the DialHD products.  (See id. at 33 ("Donald Bowers and DialHD, Inc. have been working with Mr. Guoliang Qu of Nanjing Haiyi Software, LLC throughout the past year in the development of the DialHD products . . . .").)

He attaches two alleged contracts between DialHD and Haiyi in his response, and both contracts state that the address for Haiyi is Shunke Shangwu, Suite 301, 4-5 Hunan Road, Nanjing, Jiangsu, China 210009.  (See id. at Ex. E.)

And he claims that the algorithm in the DialHD products was developed by Jie Hiang ("Hiang") of Haiyi.  As support, he attaches an undated letter from Hiang to Don Bowers, which makes the same claim, and also lists the address for Haiyi as Shunke Shangwu, Suite 301, 4-5 Hunan Road, Nanjing, Jiangsu, China 210009.  (See id. at 35 ("Dr. Jie Huang, Haiyi Software's Developer, has provided a statement regarding his qualifications and his association with Haiyi Software in the development of the algorithm used in the DialHD products.") & Ex. E attached thereto ("I have been long time friendship with Mr. Guoliang Qu. I work closely with Nanjing Haiyi Software. I am the major contributor for the Haiyi audio DSP research and technologies (including echo cancellation, etc.).").)

ClearOne hired an investigator in China to review the public records of Haiyi and to

48

conduct a site visit to the address provided by Mr. Bowers.  (See Redacted Investigation Report (attached as Ex. C to ClearOne's Mem. Supp. 7th Mot. OSC).)  According to the public records in China, Haiyi was recently incorporated on April 7, 2009 by Qu, and is registered at the address of Room 402, Unit 3, Building 6, No. 1, Xiaomenkou, Gulou District, Nanjing.  (See id. at 4.)

The registered office of Haiyi is not a business address, but rather a shabby apartment building as shown in a photograph attached to the Redacted Investigation Report.  (See id. at 11-12.)  According to public records, Qu is a "Chief" with the Security Department of Xinxin Huaqiao Hotel, and his wife is a "Sewer" at Nanjing Quilt & Clothing Factory.  (See id. at 5-7.)  Haiyi has two registered shareholders: Qu and Shuai Xu, the latter of which is a twenty-three-year-old student at Chongqiang Normal University.  (See id. at 5, 8-9.)

The Chinese investigator visited the address provided by the Subject Parties at Shunke Shangwu, Suite 301, 4-5 Hunan Road, Nanjing, Jiangsu, China 210009, and discovered that it was occupied by Huadan Legal Information Consulting Center, whose staff had never heard of Haiyi.  (See id. at 9-10 (showing photographs of the address).)  Inquiry was made to the property management company and the investigator was told they never had any registered record of Haiyi or Qu since the building was set up for business in 1997.  (See id. at 9.)  The conclusion of the Chinese investigator was that Haiyi "appears to be a bogus company."  (Id. at 13.)

The evidence supports such a conclusion.

**6.      The Creation of a Functioning DialHD AEC4 and HD4551 Product Required Possession of the Simphonix Source Code and the Honeybee Code, and the Evidence Shows that Dr. Yang Possessed and Used the Code In Violation of the Court's Orders.**

The creation of a working AEC algorithm, and its implementation into a working

product, is something that cannot be done in months, may take years, and may not be able to be accomplished at all, even by smart engineers or Ph.Ds. (See, e.g., Oct. 20, 2008 Trial Tr. at 116-17 (T. Bathurst testimony that developing AEC is long and complex process), 164 (same); Oct. 21, 2008 Trial Tr. at 67 (T. Bathurst testifying that inventing an AEC algorithm is hard; people have tried and failed); Oct. 27, 2008 Trial Tr. at 133-34 (R. Lockhart testimony that it is difficult to develop AEC; not many people can do AEC well; Biamp hired at least two engineers to develop AEC, and they could not do it); Nov. 8, 2007 Dep. of M. Kotvis at 22:4-6 ("Q. In your experience, is developing an acoustic echo cancellation algorithm a difficult task? A. Yes.") (read to jury on Oct. 27, 2008); id. at 9:23-20:4, 21:20-22:6, 22:20-25, 23:17-24:6, 26:8-18, 27:24-28:17 (describing Biamp's numerous efforts to develop AEC, including hiring Ph.D. who could not do it).)

Engineers Derek Graham and Thomas Makovicka testified at the July 31, 2009 hearing that it would be impossible to independently develop from scratch a working AEC algorithm to function in a new product like the AEC4, in the time between the trial date and the June 2009 purchase of the product by ClearOne's investigator. (July 31, 2009 Hr'g Tr. at 51-52, 98.)

And, as the court has described, even if it were possible to independently develop a working AEC algorithm of the type in the DialHD AEC4 or HD4551 products, the evidence shows that the audio digital signal processing between the Simphonix, AEC4, and HD4551 units is the same and would not be the same unless the same algorithm and/or code base was used.

ClearOne presented detailed testimony establishing that someone had to have the Simphonix source code in order to create the AEC4 and HD4551 products. First, Thomas Makovicka explained that some user interface commands had been changed from the Simphonix

to the AEC4 product and that such changes could only have been made by a person possessing the Simphonix source code. (July 31, 2009 Tr. at 122-27; July 2009 Hr'g Exs. 67, 68, 69.) Second, Mr. Makovicka testified that, in addition to changes in the source code relating to the user interface commands, there had been modifications within the "algorithmic" Simphonix code, necessary to adapt it to provide additional functionality to the DialHD AEC4 unit, which would have required the core AEC source code files for the Simphonix code. (July 2009 Tr. at 108-116; July 2009 Hr'g Exs. 70, 71.)

Mr. Makovicka also demonstrated how a Simphonix feature that had been marketed as "coming soon" in earlier WideBand materials was now a functional feature offered by the DialHD AEC4 product. (See id. at 116-20.)

And he testified that although some of the interface commands had changed, and there had been some "add ons" to the Simphonix code, none of these things changed the core AEC and related algorithms. In fact, as Mr. Makovicka pointed out, all of the add-ons made in the AEC4 code could be disabled or turned off, so that the produce worked exactly the same as the Simphonix. (See generally T. Makovicka testimony in July 2009 Tr. beginning at page 91.)

The slight differences in the output signal demonstrate that someone is using the source code to make modifications to the code. But the differences are immaterial to the fundamental design of the algorithm. (See 2nd Graham Decl. ¶ 22.)

The evidence indicates that the code in the DialHD HD4551 originated with the WideBand Simphonix and/or the DialHD AEC4 code, and given that these changes originate in the code, someone necessarily had to modify the *source code* to change the processing of the lower-end of the signal, and to eliminate the sudden, downward dip that was present in the

WideBand Simphonix and DialHD AEC4.  In order for someone to modify the Simphonix/AEC4 code to account for these differences, the following must be true:

a.     Someone must have access to the source code.

b.     The person must be familiar enough with the characteristics of the code, and its reaction to the frequency response test, to modify the code to yield the differences reflected above.

c.     The revised source code must be compiled into object or machine code.

d.     The resulting object code must be loaded into the unit.

(See 2nd Graham Decl. ¶ 23.)[23]

The court finds that that "someone" is Jun Yang.  The revisions ("updates") to the code running in the AEC4 and HD4551 products show that Jun Yang is participating in the continuing violations of the court's orders.

Evidence from trial shows that, of all the WideBand Defendants, and in fact of all the Subject Parties, only Jun Yang is capable of writing or modifying source code to provide for the

---

[23]The conclusion that the DialHD HD4551 product contains code that was modified from that used in the AEC4 product is directly supported by the DialHD DSP Utility software that accompanied the DialHD AEC4 and the DialHD HD4551 products.  During the previous tests of the AEC4 product, the DialHD DSP Utility software indicated that the AEC4 contained firmware version "SV704." The DialHD DSP Utility software that was provided with the HD4551 product contained firmware version "SV705," which under standard naming conventions is an indication that the code in the DialHD HD4551 is the very next generation of the same code used in the DialHD AEC4 product.  (See Figs. 9 & 10 in 2nd Graham Decl. ¶ 24.)

Furthermore, the DialHD DSP Utility software identified the serial number of the HD4551 as "R0710400-52537."  The DialHD DSP Utility software identified the serial number of the AEC4 as R0710400-52725 (also, this matches the serial number that was on the outside of the AEC4 unit).  In this industry, an earlier serial number indicates the product was made earlier in time, and so it appears that the HD4551 mixer board was manufactured before that in the AEC4.  (See 2nd Graham Decl. ¶ 25.)

additional functionality that was referenced in the DialHD AEC4 product and discussed by Mr. Makovicka on July 31, 2009. The recent modifications to the code—which are reflected in the analysis of the most recent version of WideBand's Simphonix Si-400, the HD4551 product—demonstrate a familiarity with the Honeybee Code and infringing WideBand Code that, as the record has shown, only Dr. Yang possesses.

Moreover, Dr. Yang was extremely possessive of the source code for all the WideBand products, which he described with words like "mine" and "my knowledge." (See, e.g., Oct. 27, 2008 Trial Tr. (J. Yang, witness) at 21:12-13 ("I have my algorithm in my mind."), 24:6-7 ("That's my prediction. I'm sure my algorithm is better than [ClearOne's]."), 51:7-8 ("A Yes. That's my algorithm too. I did the tracking camera algorithm. Q Do you claim to own that algorithm too? A I didn't claim. That's what I say, that algorithm is still in my mind."), 56:5-8 ("I did tell them I did work on this phone. I made that phone work. It didn't work before. I made that work. That's why I say that's like my baby."), 66:3-:10:7 (discussing how Yang stripped the comments from the Biamp source code because selling the same "sounds like sell my soul"); see also, e.g., Oct. 29, 2008 Trial Tr. (J. Yang, witness) at 66:6-8 ("Q Dr. Yang, did you come up with anything new for this LMS algorithm? A Yes, I did it my way."), 103:1-3 ("Actually, there is more equation there doing to set up those, you know, variables, you know, that's an important thing, that's my algorithm . . . .").)

He also recently testified that he was the only person who maintained any copies of the Simphonix source code. (See July 8, 2009 Dep. of Jun Yang at 82-83 ("Yang Dep.") (excerpts attached to ClearOne's Mem. Supp. 7th Mot. OSC as Ex. E).)

Yet Dr. Yang says he scrubbed evidence from WideBand computers, in clear violation of

the court's Preservation Order. By doing so, the expert who was to image the WideBand

computers under the order was not able to verify that the code was no longer available to the

WideBand Defendants. This opened the door for Dr. Yang and others to hide their use of the

Honeybee Code in other products.

Finally, Dr. Yang has been very resistant to ClearOne's and the court's efforts to obtain

information from him. As discussed above, the court found that Dr. Yang committed perjury

during his pre-trial deposition. Recently, he refused to comply with the court's order requiring

disclosure of any knowledge he had about WideBand and DialHD. And he has not provided any

evidence to challenge ClearOne's allegations and evidence against him.

Given all of the above—including Dr. Yang's expertise with the technology, his

familiarity with the Honeybee Code and WideBand code, and his behavior during this

litigation—the court finds that clear and convincing evidence supports the conclusion that Dr.

Yang was involved in the development of the AEC4 and DialHD HD4551 products in violation

of the Permanent Injunction and August 2009 TRO.

## 8. The Continued Modifications to the Source Code, and the Sale and Marketing of ClearOne's Stolen AEC Technology in China, have harmed ClearOne.

As a technology company, ClearOne's primary assets consist of intellectual property,

such as the Honeybee Code. For a technology company like ClearOne, the fact that its stolen

intellectual property is now in China is very damaging to ClearOne because, in particular: (i) it is

very difficult, if not impossible, for a company to enforce its intellectual property rights overseas;

(ii) ClearOne has lost control over that intellectual property; and (iii) the cost of attempting to

find, monitor, and enforce, intellectual property rights, in a foreign country is great. (See

54

Bathurst Decl. ¶¶ 22-26.)

## II. CONCLUSIONS OF LAW

At the end of the July 31, 2009 evidentiary hearing, the court granted a temporary

restraining order, prohibiting the sale of the DialHD, Inc. ("DialHD") AEC4 and Mix-4 products,

and issuing yet another warning to the WideBand Defendants and the other Subject Parties:

> HOWEVER, GENTLEMEN, I TELL YOU THAT **IF I HAVE EVIDENCE
> THAT IN THE INTERIM *ANY* OF THESE PRODUCTS ARE *SOLD OR
> TRANSFERRED*, I WILL VIEW THAT AS CONTEMPT WORTHY OF
> CRIMINAL PROSECUTION**.

(July 31, 2009 Transcript (Docket No. 1849) at 174-75 (emphases added).)  The court formalized

its oral ruling three business days later, on August 5, 2009, by entry of a written order (the

"TRO").  (See generally Aug. 5, 2009 Temporary Restraining Order & Order from July 31, 2009

Hr'g (Docket No. 1819).)

Despite the court's clear warning at the July 31, 2009 hearing, in September 2009,

ClearOne was able to purchase the Simphonix Si-400 / DialHD AEC4 product – albeit under yet

another new name: the "HD4551." Again, while the name of the product has been changed, all

the other features remain identical to the WideBand Simphonix Si-400 (and the DialHD AEC4).

In addition, testing performed on the HD4551 unit confirms that, once again, the

Contemnors have used the same algorithms in the HD4551 as used in both the WideBand

Simphonix and the Dial AEC4 products (and as used in the Honeybee Code), and which contains

the ClearOne trade secrets that are the subject of this litigation and the Permanent Injunction

entered by this Court.  (See generally Permanent Injunction (Docket No. 1525).)

Although the court has attempted to provide relief to ClearOne by issuing injunctions and

related orders, the court's orders have not been obeyed.

Perhaps the only way that the Contemnors will be candid and forthcoming, and purge themselves of their contemptuous behavior, is under the threat of incarceration. The court has tried everything else, and it is clear that extraordinary measures must be taken at this point to protect the integrity of these judicial proceedings in the face of the blatant and continuing contempt.

**A.**     **Jurisdiction**

As an initial matter, DialHD Inc. contends that the court does not have jurisdiction over it because it is not located in Utah and not a party to the litigation.

Non-parties who reside outside the territorial jurisdiction of a district court are subject to that court's jurisdiction if, with actual notice of the court's order, they directly violate an order or actively aid and abet a party in violating the court's order. This is so despite the absence of other contacts with the forum. See Fed. R. Civ. P. 65(d)(2)(c) (injunctive order binds "persons who are in active concert or participation" with the parties and "who receive actual notice" of order); Reliance Ins. Co. v. Mast Constr. Co., 159 F.3d 1311, 1317 (10th Cir. 1998) (recognizing that non-party may be subject to court's jurisdiction under Fed. R. Civ. P. 65(d) in contempt proceedings); SEC v. Homa, 514 F.3d 661, 673 (7th Cir. 2008); Waffenschmidt v. MacKay, 763 F.2d 711, 714 (5th Cir. 1985).

The court has jurisdiction over DialHD, Inc. for violations of the Permanent Injunction and the August 5, Temporary Restraining Order.

First, DialHD (through its CEO Donald Bowers) had actual notice of the court's August 5, 2009 Temporary Restraining Order and prohibitions in the Permanent Injunction (which was

issued as an extension of the expanded preliminary injunction). Donald Bowers was present during the July 31, 2009 hearing, and heard not only the testimony but the court's bench ruling issuing the TRO. The record also reflects that he received actual notice of the February 2009 Order Expanding the Preliminary Injunction, which was then incorporated into the Permanent Injunction. (See Feb. 6, 2009 Proof of Service on Donald Bowers c/o Randolph Frails of Order Expanding Preliminary Injunction (Docket No. 1449); Feb. 7, 2009 Proof of Service on Donald Bowers c/o his wife (Docket No. 1450); July 20, 2009 Return of Service (Docket No. 1793) at 2 (enclosing Permanent Injunction); July 31, 2009 Minute Entry (Docket No. 1845) (stating that "Service of all future pleadings, orders, or other papers in this case shall be deemed accomplished for all purposes, including F.R.C.P. 4 and 5, upon e-mail delivery to the Subject Parties as follows: To Donald Bowers: Care of Randolph Frails, at frailsr@knology.net."); Donald Bowers's Sept. 9, 2009 Notice of Appeal of TRO (Docket No. 1905).)

Second, the evidence presented to the court shows that DialHD directly violated the Permanent Injunction and the TRO, in active concert or participation with Lonny Bowers. There is no question that DialHD was selling the products at issue here despite the two orders.

Accordingly, the court holds that it has jurisdiction over DialHD Inc. for purposes of these contempt proceedings.

**B.      Civil Contempt**

Under federal law, the court has the inherent power to coerce compliance with its orders, sanction behavior constituting fraud on the court, and vindicate its authority in the face of contumacious behavior. See, e.g., Chambers v. NASCO, Inc., 501 U.S. 32, 43-44 (1991) ("It is

firmly established that the power to punish for contempts is inherent in all courts. This power reaches both conduct before the court and that beyond the court's confines, for the underlying concern that gave rise to the contempt power was not merely the disruption of court proceedings. Rather, it was disobedience to the orders of the Judiciary, regardless of whether such disobedience interfered with the conduct of trial.") (internal citations, omissions, and quotation marks omitted). "[C]ontempt is considered civil if the sanction imposed is designed primarily to coerce the contemnor into complying with the court's demands and criminal if its purpose is to punish the contemnor, vindicate the court's authority, or deter future misconduct." United States v. Lippitt, 180 F.3d 873, 876-77 (7th Cir. 1999) (citing Hicks v. Feiock, 485 U.S. 624, 631-32 (1988)).

The court finds that ClearOne has established, by clear and convincing evidence, that DialHD, Inc., WideBand Solutions, Inc. (a Massachusetts Corporation), Lonny Bowers, and Jun Yang (collectively, the "Contemnors") are in civil contempt for violating the court's Permanent Injunction and August 5, 2009 TRO. ClearOne has also established, by a preponderance of the evidence, that it has been harmed by such conduct.

### 1.      Standard

To succeed on its motion for an order finding each of the enjoined parties in civil contempt, ClearOne must prove, by clear and convincing evidence, that (1) the order at issue was valid and enjoined conduct in reasonable detail (i.e., was sufficiently specific when defining the conduct enjoined); (2) the enjoined party had actual knowledge of the order through personal service or otherwise and was subject to it; and (3) the enjoined party disobeyed the order. See,

e.g., Reliance Ins. Co., 159 F.3d at 1315-16; Fed. R. Civ. P. 65(d)(2) (defining persons bound by injunction and restraining order).

The standard applied to determine whether third parties are in contempt for violation of an order being enforced (e.g., the Permanent Injunction and August 2009 TRO) is essentially the same, but instead with the showing that the third parties were in "active concert or participation" with the expressly enjoined parties. See Fed. R. Civ. P. 65(d)(2).

As for the compensatory damages ClearOne seeks (e.g., attorneys' fees and costs), it must prove such damages by the lesser standard of a preponderance of the evidence. Federal Trade Comm'n v. Kuykendall, 371 F.3d 745, 751 (10th Cir. 2004); Reliance Ins. Co., 159 F.3d at 1318.

In civil contempt proceedings, disobedience of the order need not be willful. Rather, "[a] district court is justified in adjudging a person to be in civil contempt for failure to be reasonably diligent and energetic in attempting to accomplish what was ordered." Bad Ass Coffee Co. of Hawaii, Inc. v. Bad Ass Ltd. P'ship, 95 F. Supp. 2d 1252, 1256 (citing Goluba v. School Dist. of Ripon, 45 F.3d 1035, 1037 (7th Cir. 1995)).[24]

---

[24]A person facing an order to show cause "may assert a defense to civil contempt by showing by clear and convincing evidence that 'all reasonable steps' were taken in good faith to ensure compliance with the court order and that there was substantial compliance, or relatedly by proving 'plainly and unmistakenly' defendants were unable to comply with the court order." Id. n.8. But nothing has been presented by the Contemnors that would enable them to rely on such a defense.

## 2.    Finding of Contempt

### a.    Valid and Sufficiently Detailed Orders Existed.

The orders at issue here are the April 2009 Permanent Injunction and the August 5, 2009

TRO.  Although there has been evidence that other court orders have been violated, the other

orders were attempts to enforce the jury verdict and the orders carrying out that verdict (i.e., the

Permanent Injunction and August 2009 TRO).  The proven violations of other orders—such as

the No Asset Transfer Orders, the Preservation Order, and the multiple disclosure orders—and

the false representations to the court are more evidence that the Contemnors are violating the

Permanent Injunction by making, marketing, and selling products that use the stolen trade secret,

ClearOne's Honeybee Code.

Both the Permanent Injunction and the August 5, 2009 TRO were valid orders.[25]  And the

court finds that they were sufficiently clear in defining what conduct was prohibited.

When considering whether the injunction was sufficiently specific, the court should look

at the injunctive order as a whole, including not only its text but also the context of the litigation.

Reliance Ins. Co., 159 F.3d at 1316;  see also Drywall Tapers & Pointers, Local 1974 v. Local

530 of Operative Plasterers & Cement Masons Int'l Ass'n, 889 F.2d 389, 395-96 (2d Cir. 1989)

(defendant's conduct can demonstrate lack of ambiguity in injunctive order).

> Rule 65(d) requires only that the enjoined conduct be described in reasonable, not
> excessive, detail—particularly in cases like this when overly precise terms would
> permit the very conduct sought to be enjoined.  See Scandia Down Corp. v.

---

[25]Of course the WideBand Defendants take issue with the conclusions in the Permanent
Injunction and TRO, but that is not what the court means by "validity."  Nothing in the record
supports a finding that the court did not have authority to issue the orders.

<u>Euroquilt, Inc.</u>, 772 F.2d 1423, 1431-32 (7th Cir. 1985) (Rule 65(d) "does not require the impossible. There is a limit to what words can convey . . . . The right to seek clarification or modification of the injunction provides assurance, if any be sought, that proposed conduct is not proscribed.").

<u>Reliance Ins. Co.</u>, 159 F.3d at 1316-17.

Here, there can be no genuine doubt about what the orders prohibited. In addition to the clear language of the two orders, the court held multiple hearings before issuing them.

b.      <u>The Contemnors Had Appropriate Notice of the Orders.</u>

An injunction is binding on those "'who receive actual notice of the order by personal service or otherwise.'" <u>Reliance Ins. Co. v. Mast Constr. Co.</u>, 159 F.3d 1311, 1317 (10th Cir. 1998) (quoting Fed. R. Civ. P. 65(d)).

WideBand Massachusetts, Lonny Bowers, and Jun Yang are all parties to the case. Every order, including the Permanent Injunction and August 5, 2009 TRO, was served upon them by the Clerk of the Court. They had proper notice.

As for DialHD, Inc., the court simply points to the discussion above in the section addressing jurisdiction and how DialHD, Inc. had actual notice of the orders.

c.      <u>Contumacious Behavior and Disobedience</u>

The court finds that ClearOne has presented clear and convincing evidence that DialHD's AEC4 and HD4551 products are repackagings of WideBand's Simphonix product under different names. This is in direct violation of the Permanent Injunction and August 5, 2009 TRO. The court's Findings of Fact conclusively show that WideBand Massachusetts, DialHD, Lonny Bowers, and Jun Yang were all involved with the repackaging, marketing, and selling of the

barred products. Accordingly, the court finds that the final element—disobedience of the order—is clearly established.

### 3. Authority to Fashion Remedies for Civil Contempt

Not only have the Contemnors violated the court's Permanent Injunction and August 5, 2009 TRO, but they continue to possess and modify the code, and modify the appearance of the product in an effort to hide its origin from ClearOne and the court. If the product is re-branded again with a completely different brand and product configuration, it will be extremely difficult – and very costly – for ClearOne to monitor and discover such abuse.

According to the Tenth Circuit, "[s]anctions for civil contempt may only be employed for either or both of two distinct remedial purposes: (1) to compel or coerce obedience to a court order . . . ; and (2) to compensate the contemnor's adversary for injuries resulting from the contemnor's noncompliance." O'Connor v. Midwest Pipe Fabrications, Inc., 972 F.2d 1204, 1211 (10th Cir. 1992) (internal citations and quotation marks omitted).

Accordingly, for the reasons set forth above, the court **ORDERS** as follows:

1. The August 5, 2009 TRO is hereby expanded to expressly include the DialHD HD4551 product and any other DialHD product using the Honeybee Code. The court will, in a separate ruling, modify and expand the Permanent Injunction to reflect the developments established in these contempt proceedings.

2. DialHD, Inc., and all those working in active concert or participation with DialHD, shall immediately halt all development, sale, and/or marketing of all DialHD products, including in China.

3.     The Contemnors shall arrange for and obtain the delivery to the United States, care of ClearOne or its designated agent, of all code and other design materials and intellectual property covered by the Permanent Injunction, the August 5, 2009 TRO, and this Order no later than Monday, December 21, 2009.  They shall also provide written evidence to the court and ClearOne confirming that they have done so, again, no later than Monday, December 21, 2009.

4.     The court hereby orders Lonny Bowers to self-surrender to this court on Friday, January 8, 2010, at 10:00 a.m. for incarceration (or be subject to arrest through a bench warrant) unless and until he has proven to the court that he and WideBand Massachusetts have (a) complied with the court's order to halt the development, sale and/or marketing of all DialHD products, and obtained the delivery to the United States of all code and other design materials and intellectual property held by WideBand Massachusetts and DialHD; (b) has made full and genuine disclosures and cooperated in discovery, and (c) the court has had the opportunity to review the results of such disclosures and discovery, and is satisfied that the information provided is sufficient to purge Mr. Bowers and WideBand Massachusetts of their contempt.

5.     The court hereby orders Jun Yang to self-surrender to this court on Friday, January 8, 2010, at 10:00 a.m. for incarceration (or be subject to arrest through a bench warrant) unless and until (a) he has proven to the court that he has made full and genuine disclosures and cooperated in discovery, and (b) the court has had the opportunity to review the results of such disclosures and discovery, and is satisfied that the information provided is sufficient to purge Jun Yang of his contempt for violation of the disclosure orders.

6.     The court finds that ClearOne is entitled to receive its reasonable attorneys' fees

and costs incurred in pursuing the two latest orders to show cause against the Subject Parties. ClearOne shall submit an affidavit and documentation of the costs and attorneys' fees as soon as practicable but no later than Monday, December 21, 2009, after which the Magistrate Judge shall issue a ruling awarding those costs and fees reasonably incurred in relation to the First OSC. The amount of any award shall be reduced to a judgment in favor of ClearOne against Lonny Bowers, Jun Yang, WideBand Massachusetts, and DialHD (the "Contempt Judgment"), which Judgment shall be joint and several. The fees and costs, if reasonable and documented, will be awarded to compensate ClearOne for its direct losses incurred in bringing the actions of the Contemnors to the attention of the court and obtaining the relief granted herein.

7.      A hearing on Friday, January 8, 2010, at 10:00 a.m. is hereby set to determine whether the Contemnors have purged themselves of contempt. Lonny Bowers and Jun Yang are each ordered to appear in person at the hearing. WideBand Massachusetts and DialHD, Inc. are ordered to appear with a corporate representative present in the courtroom as well as proper legal counsel.

DATED this 19th day of November, 2009.

BY THE COURT:

TENA CAMPBELL
Chief Judge